**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ivan SIGMOND–BALLESTEROS,**
**Defendant–Appellant.**

**No. 00–50408.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 2001.

Filed April 20, 2001.

Opinion Withdrawn and Amended
Opinion Filed April 12, 2002.

Vincent J. Brunkow, Federal Defenders of San Diego, Inc., San Diego, CA, for the defendant-appellant.

Patrick K. O'Toole, United States Attorney, and Mark A. Inciong, Assistant United States Attorney, U.S. Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before FERGUSON, TASHIMA, and FISHER, Circuit Judges.

## ORDER

The opinion filed on April 20, 2001, and reported at 247 F.3d 943, is withdrawn and replaced by the amended opinion filed concurrently with this order. With these

amendments, the petition for panel rehearing is denied.

## OPINION

TASHIMA, Circuit Judge.

### I.

On January 27, 2000, United States Border Patrol Agent James Wright ("Wright"), in his 1998 Ford Expedition, was observing traffic on Highway 86 from the median. His vehicle was facing the northbound lanes, with his headlights on, so that "any traffic traveling northbound would have been intersecting the floodlights or the direction of [the] headlights going across the freeway." At approximately 4:20 a.m., Wright observed a F350 Ford pick-up truck with a camper shell pass his location. As the truck passed by, the driver of the truck "put his hand partially covering his face."

Finding this gesture suspicious, Wright decided to follow Defendant. He maneuvered onto the highway and quickly caught up to Defendant, who was traveling in the fast lane. Upon realizing that Wright's vehicle was at an unsafe distance behind him (two to three car lengths), Defendant made what was characterized by Wright as a "sudden change into the slow lane" and decreased his speed. Wright, continuing to travel in the fast lane, then pulled alongside Defendant's truck and activated his "alley light."[1] Wright could see that the rear seat was missing. He did not, however, see anything inside of the camper.

When Wright pulled up to the front of the passenger compartment of Defendant's truck, with his alley lights still on, he noticed that Defendant once again placed his hand between the light and his face, in what Wright characterized as an attempt to "conceal[ ] his face again." Wright then slowed down and pulled behind Defendant's truck so as to run Defendant's license plate number. As he moved behind Defendant's truck, however, Defendant pulled off onto the shoulder. At that moment, Wright activated his emergency lights. Defendant slowed down, and eventually pulled off the highway by making a right turn into a small dirt road and stopping his vehicle almost immediately thereafter. Wright exited his vehicle and upon approaching Defendant's truck, noticed approximately eighteen individuals lying on a blanket in the rear area of the truck's cab. After confirming the presence of several undocumented aliens, Defendant was arrested and eventually charged with transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).

Defendant originally pled not guilty. He also filed a motion to suppress the evidence obtained as a result of the stop, claiming that Wright lacked reasonable suspicion to stop him. The district court denied his motion, finding that:

The Court certainly, if it isolated the factors ... might well also arrive at your conclusion; however, the Court will not view the factors in isolation. [Government's counsel] has delineated factors that this Court would agree would lead a prudent officer to have reasonable suspicion. The time of morning, 4:20; an area known for alien smuggling. We have a vehicle traveling at that time when the usual traffic is commercial. We have—which is not disputed by any testimony—a driver that's attempting to obscure the view of his face. The agent's training and experience has led him to believe that this occurs because of the stop-and-flight situations with alien smugglers. This is the knowledge and experience, that, of course, the

---

1. An alley light is a bright light mounted on the rooftop light bar that "shines out toward the side," *i.e.*, on an axis which is perpendicu- lar to the axis along which the vehicle is traveling.

Court must take into consideration in determining whether or not there is reasonable suspicion. The ·sudden move to a different lane and then the move off of the main road of travel to the dirt shoulder, all of this would lead the court to believe that there was reasonable suspicion.... The Court should also mention as factors to be considered by the seat that is missing in the back of the cab section of the truck.

Defendant subsequently pled guilty, but reserved his right to appeal the district court's denial of his motion to suppress. After being sentenced, Defendant timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291. Because the determination of reasonable suspicion is a mixed question of law and fact, we review the district court's decision de novo. *See United States v. Garcia–Camacho*, 53 F.3d 244, 245 (9th Cir.1995). We reverse.

## II.

■ The Fourth Amendment's prohibition against unreasonable searches and seizures extends to the investigatory stop of a vehicle. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In reviewing a determination of reasonable suspicion, we "must look at the 'totality of the circumstances' of [the] case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); *see also United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992), *amended by* 997 F.2d 1306 (9th Cir.1993) (stating that an officer may not detain a motorist without a showing of a

"particularized and objective basis for suspecting the particular person stopped of criminal activity") (quoting *Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690). Thus, while some factors may be "susceptible to innocent explanation, and some factors are more probative than others," the inquiry is whether, taken together, "they sufficed to form a particularized and objective basis" for making the stop. *Arvizu*, 122 S.Ct. at 753.

■ Furthermore, reasonable suspicion may not be "based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Rodriguez–Sanchez*, 23 F.3d 1488, 1492 (9th Cir.1994), *overruled in part on other grounds by United States v. Montero–Camargo*, 208 F.3d 1122, 1131–32 (9th Cir.) (en banc), *cert. denied sub nom. Sanchez–Guillen v. United States*, 531 U.S. 889, 121 S.Ct. 211, 148 L.Ed.2d 148 (2000). Thus, we will not find that a set of factors amounts to reasonable suspicion if "the profile tendered by the [government is] 'calculated to draw into the law enforcement net a generality of persons unmarked by any really articulable basis for reasonable suspicion.'" *See Garcia–Camacho*, 53 F.3d at 246 (quoting *Rodriguez*, 976 F.2d at 596). Guided by these principles, we conclude that the factors relied on by the district court are not sufficient to form a "particularized and objective basis" for the stop. *Arvizu*, 122 S.Ct. at 753.

## A. Lane Change and Move Off the Main Road

■ The district court found that Wright was justified in relying on Defendant's driving behavior in his reasonable suspicion analysis. This was error.[2]

---

2. There is no evidence that Defendant broke any traffic laws in making any lane changes. *Cf. Whren v. United States*, 517 U.S. 806, 813,

116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (concluding that a "pretextual" traffic stop for a minor traffic infraction was constitutional be-

Based on Wright's driving behavior, Defendant could have reacted in one of three ways: He could have done nothing, he could have sped up, or he could have yielded by changing lanes and ultimately pulling off the road. Given the limited options available to him, it is difficult to imagine a more rational reaction than Defendant's.[3] *See* Calif. Dep't of Motor Vehicles, *Calif. Driver Handbook* 65 (2000) (instructing drivers to " 'lose' the tailgater as soon as you can by changing lanes. If you can't change lanes, slow down enough to encourage the tailgater to go around you. If this does not work, pull off the road when it is safe and let the tailgater pass."), *available at* http://www.dmv.ca.gov/pubs/pubs. htm#mc. In contrast, if Defendant had done nothing and stayed his course, Wright may have found it suspicious that Defendant "fail[ed] to acknowledge" him. *See Arvizu*, 122 S.Ct. at 752 (finding it "quite reasonable that a driver's . . . failure to acknowledge a sighted law enforcement officer" might be suspicious, depending on the circumstances); *cf. United States v. Jimenez–Medina*, 173 F.3d 752, 755 (9th Cir.1999) ("a driver's preoccupation with a police vehicle following him is a 'quite natural reaction' and was held to be insufficient to justify an investigatory stop") (discussing *Robert L.*, 874 F.2d at 703). Or, if Defendant had sped up, he would have run the risk of exceeding the speed limit, thereby giving Wright probable cause to stop the vehicle for a speeding violation. Worse yet, Wright could have concluded that Defendant was trying to evade him. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (finding that evasive actions contribute to the totality of circumstances suggesting reasonable suspicion). Based on Defendant's available options, "[i]t is, in fact, difficult to imagine what [Defendant] could have done at that point that might not have appeared suspicious to a Border Patrol agent." *Montero–Camargo*, 208 F.3d at 1136 (emphasis omitted); *Garcia–Camacho*, 53 F.3d at 247 n. 5 ("It is not difficult to imagine the government one day arguing that driving at constant speed constitutes suspicious conduct because the best way to evade Border Patrol agents is not to stand out by going faster or slower than the normal flow of traffic.").

We are unwilling to place motorists in a "damned if you do, equally damned if you don't" situation, *Montero–Camargo*, 208 F.3d at 1136, especially when their conduct conforms to the safe-driving advice given by the California Department of Motor Vehicles. We thus conclude that Defendant's driving behavior could not be relied upon to justify reasonable suspicion.

cause " 'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' " (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978))). "Although not breaking any traffic laws 'is not determinative, it is significant.' " *Garcia–Camacho*, 53 F.3d at 247 (quoting *United States v. Robert L.*, 874 F.2d 701, 704 (9th Cir.1989)). Furthermore, Wright never testified that Defendant was driving erratically or evasively. *See Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. 2574 (finding that "[t]he driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion."). On the contrary, the evidence shows that it was Wright who was driving unsafely—coming within two or three car lengths from Defendant's vehicle while traveling at a greater rate of speed.

**3.** The fact that Defendant's lane change was "sudden" does not alter this conclusion because the suddenness of that move was also necessitated by Wright's greater rate of speed.

■ It is true, as the government points out, that "conduct that is not necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus," *id.* at 1130, especially in light of the agent's experience, *see Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. 2574. But, although the agent's experience may provide a background against which the relevant facts may be assessed, his analysis must be based on "objective observations," *Cortez*, 449 U.S. at 418, 101 S.Ct. 690, and the inferences he draws must be objectively reasonable. *See United States v. Hernandez–Alvarado*, 891 F.2d 1414, 1416 (9th Cir.1989) ("Permissible deductions or rational inferences must be grounded in objective facts and be capable of rational explanations."). Here, the agent never testified about the relevance of the lane change or the move to the side of the road. The agent did not testify that, in his experience, alien smugglers tended to react the way Defendant did. Nor did the agent testify that he thought Defendant was trying to evade him by pulling off the road. Thus, we have not been provided with a background against which we can assess the facts of this case, and we are unable to conclude that Defendant's driving behavior was suspicious in any way.[4]

**B. Hand Gestures**

■ In concluding that Wright had reasonable suspicion to believe that criminal activity was afoot, the district court placed great emphasis on the fact that Defendant "attempt[ed] to obscure the view of his face." Although concealment of one's face may, in certain instances, be considered by law enforcement officers in their reasonable suspicion analysis, we hold that Wright impermissibly did so here. We so conclude because we find that Defendant's reactions were necessitated by the agent's actions.

The sudden introduction of a light source into the driver's compartment of a vehicle, while the vehicle is operated at night, can be disruptive and can lead to a decrease in visibility, if not temporary blindness. Hence, rear-view mirrors are equipped with a mechanism that diffuses the light from approaching cars. For the same reason, the California Vehicle Code provides for the maximum height of headlights. *See* Cal. Vehicle Code § 24400 ("The headlamps and every light source in any headlamp unit shall be located at a height of not more than 54 inches nor less than 22 inches."). It is also the reason the use of upper beam headlights and spotlamps is so restricted. *See id.* § 24407 ("On a straight level road under any condition of loading none of the high intensity portion of the beam shall be directed to strike the eyes of an approaching driver."); *id.* § 24409 ("Whenever the driver of a vehicle approaches an oncoming vehicle within 500 feet, he shall use a distribution of light or composite beam so aimed that the glaring rays are not projected into the eyes of the oncoming driver"); *id.* § 24404 ("No spotlamp shall be equipped with any lamp source exceeding 32 standard candlepower or 30 watts nor project any glaring light into the eyes of an approaching driver."); *see also Karstensen v. Western Transp. Co.*, 93 Cal.App.2d 435, 209 P.2d

4. Even if the government had provided such background facts, it is unlikely that we would accept any adverse inference drawn from them here, because to do so would "likely [] sweep many ordinary citizens into a generality of suspicious appearance...." *Montero–Camargo*, 208 F.3d at 1129 (quoting *Rodriguez*, 976 F.2d at 595–96 (concluding that factors cited in the case—namely, a Hispanic man carefully driving an old Ford with a worn suspension and who looked in his rear view mirror while being followed by agents in a marked car—described "too many individuals to create a reasonable suspicion that this particular defendant was engaged in criminal activity")).

47 (1949) (wrongful death action based on blinding of motorist by spotlight); *Kline v. Barkett,* 68 Cal.App.2d 765, 158 P.2d 51 (1945) (negligence action brought for accident caused by blinding spotlight).

Here, it is undisputed that Defendant was traveling on an unlit road at night, illuminated only by his own headlights and Wright's vehicle—a Ford Expedition "set a little bit higher than a regular street model Ford Expedition." It is also undisputed that Defendant only shielded his face when he came into contact with a light source emanating from Wright's vehicle: First, when he intersected Wright's headlights, and second, when Wright shined his alley light almost directly into Defendant's face. Thus, it should come as no surprise that Defendant would twice attempt to shield his eyes from the light. Indeed, safe operation of his vehicle required nothing less. Certainly, an agent cannot create a situation which amounts to a dangerous driving condition, observe the driver react appropriately, and then base reasonable suspicion on the reaction because it somewhat comports with "suspicious behavior." To do so would give police officers across this Circuit carte blanche to harass any driver. Although we do not completely rule out the covering of one's face as an allowable factor in the reasonable suspicion analysis, based on the facts of this case, we conclude that Defendant's reaction to Wright's conduct does not contribute to a finding of reasonable suspicion.

## C. Notoriety of the Route for Smuggling

■■■■ The government asserts that "Highway 86 is a route notorious for alien smuggling, particularly when the [ ] check-point is closed." The evidence presented by the government, however, fails to support such a general statement. Wright did not testify that the road was notorious for alien smuggling. Nor did he testify that smuggling somewhat increased when the checkpoint was closed. Rather, he merely stated that "it is fairly common for smugglers to use that route," whether or not the checkpoint is closed.[5]

■■■■ Even assuming the general proposition that alien smuggling occurs with a certain level of frequency on Highway 86, reasonable suspicion cannot be based on overbroad generalizations. Indeed, we are instructed to "examine with care the specific data underlying [the] assertion" that an area is one in which "particular crimes occur with unusual regularity." *Montero–Camargo,* 208 F.3d at 1138, 1139 n. 2. Although we respect Wright's conclusions that smugglers commonly used that route, we note that Highway 86 is a four lane highway connecting the cities of El Centro, Calexico, Westmorland, Brawley, and various other small towns in Imperial County to Highway 10, and thus to the Riverside and the Los Angeles areas. "We are confident that substantially all of the traffic in [and around] these cities is lawful and that relatively few of their residents have any connection with the illegal entry and transportation of aliens." *Brignoni–Ponce,* 422 U.S. at 882, 95 S.Ct. 2574. Therefore, although relevant, the fact that Defendant was using this road is of only minimal significance.

## D. Type of Vehicle

■■■■ The government also argues that the vehicle driven by Defendant "is a ve-

---

5. Although the government emphasizes that Highway 86 is a route known to be used by smugglers when the checkpoint is closed, the testimony below indicates that (1) drivers do not know whether the checkpoint is closed until they are very close to the checkpoint, (2) checkpoint closures are not on a set schedule, and (3) alien smuggling occurs whether or not the checkpoint is closed. Thus, it would be unreasonable for Wright to assume that Defendant was attempting to avoid the checkpoint.

hicle type commonly used by alien smugglers." Once again, the government overstates Wright's testimony. At the suppression hearing, the government asked: "Have you seen, in your experience as a border patrol agent, these types of vehicles used in alien smuggling activities?" Wright responded: "Yes." Thus, all that the testimony indicates is that pick up trucks, presumably with a camper shell, have been used for smuggling before. We readily agree that many types of vehicles have been used for smuggling before. *See, e.g., Cortez,* 449 U.S. at 415, 101 S.Ct. 690 (vans, pick up trucks, other small trucks, campers, motor homes and similar vehicles); *United States v. Doyle,* 129 F.3d 1372, 1374 (10th Cir.1997) (large sedans); *United States v. Garcia–Barron,* 116 F.3d 1305, 1307 (9th Cir.1997) (rental cars); *United States v. Jackson,* 825 F.2d 853, 856 (5th Cir.1987) (sports car); *see also Rodriguez,* 976 F.2d at 596 ("We may confidently assert that all types of vehicles have been used in smuggling operations at some place."). We also agree that the size of Defendant's vehicle lends itself to the transport of illegal aliens. But light trucks and pick ups, although sometimes used by smugglers, as are many other types of vehicles, in recent years have been popular best-sellers, and are commonly used by those who are engaged in agricultural work, the construction trades, or any other trade which requires the carrying of heavy tools or implements. And, as evidenced by Wright's testimony, this particular section of Highway 86 is in an agricultural area. Therefore, even though the type of vehicle may be of some relevance in determining whether reasonable suspicion exists, it is not particularly probative here.

**E. Character of Particular Traffic Pattern for that Time of Day**

■ The government also contends that Wright was entitled to consider the time of day and the fact that "[n]on-commercial traffic in the area is not common at 4:20 a.m." in his reasonable suspicion analysis. The government, however, presented no evidence whatsoever that smuggling intensified at that time of day.[6] Nor did the government offer any evidence indicating that the checkpoint was known to be closed more often than not at that particular time of day. Nor did the government present any other evidence which would make Defendant's travel on Highway 86 suspicious. *Cf. United States v. Tiong,* 224 F.3d 1136, 1140 (9th Cir.2000) (finding that traffic pattern and time of day were relevant because defendant, at 5:30 a.m. had told custom agents that he was visiting his girlfriend in Seattle, but rather than take Highway 97 to Seattle, defendant exited on a small side road, not leading to Seattle). The only evidence presented by the government as to that issue is Wright's statement that there is no normal residential traffic at that time.[7] We are hesitant to place too much weight on this factor, as anyone traveling to a temporary construction job in the Los Angeles or Riverside area would ordinarily leave El Centro around that time. Therefore, the time of day has very little, if any, probative value.

**F. Proximity to Border**

■ According to the government, "Highway 86 is in close proximity to the

---

6. The government has also argued that Border Patrol agents considered traveling in the morning suspicious because "drug smugglers travel at that time to blend in with the work force." *Hernandez–Alvarado,* 891 F.2d at 1419 (Alarcon, J., concurring).

7. Wright also did not explain how he determined that a pick up truck was "residential," as opposed to "commercial," traffic, if, indeed, he reached such a conclusion.

United States—Mexico border." Whether the highway itself is close to the border is somewhat irrelevant. What matters is the distance between Defendant and the border at the time of the stop, which in this case, could be best determined by identifying the location of Wright's vehicle just prior to the stop. As to that issue, however, the record is silent. Wright only testified that his vehicle was parked seven miles south of the checkpoint. The record does not reflect how far from the border the checkpoint is. Even assuming that the checkpoint is close to the border, that factor is of limited value here considering the presence of two large metropolitan areas north of the stop (Los Angeles and Riverside) and several smaller cities south of the stop.[8] As the Supreme Court stated,

> [r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well. San Diego, with a metropolitan population of 1.4 million, is located on the border. Texas has two fairly large metropolitan areas directly on the border: El Paso, with a population of 360,000, and the Brownsville McAllen area, with a combined population of 320,000. We are confident that substantially all of the traffic in these cities is lawful and that relatively few of their residents have any connection with the illegal entry and transportation of aliens.

*Brignoni–Ponce,* 422 U.S. at 882, 95 S.Ct. 2574.

### G. Missing Rear Seat

▆▆▆▆ The fact that the rear seat of Defendant's truck was missing does not contribute to the reasonable suspicion calculus because the government utterly failed to present any testimony regarding the significance of a missing rear seat. Without such testimony, we are unable to decide whether Wright considered the missing rear seat as an indicium of smuggling activity. *Cf. Arvizu,* 122 S.Ct. at 750–51 (stating that officers may draw on their experience to make inferences about the circumstances); *Hernandez–Alvarado,* 891 F.2d at 1416 ("Permissible deductions or rational inferences must be grounded in objective facts and be capable of rational explanations."). Therefore, although we do not categorically reject this factor, without an articulated explanation of its relevance, it has "such a low probative value that no reasonable officer would have relied on [it] to determine whether there was reasonable suspicion to make an investigative stop." *Montero–Camargo,* 208 F.3d at 1132 (citing *Gonzalez–Rivera v. INS,* 22 F.3d 1441, 1446 (9th Cir.1994)). Thus, the district court should not have considered it.

### III.

▆▆▆▆▆ "Reasonable suspicion must be founded upon a particularized and objective basis for suspecting the particular person stopped of criminal activity. For this reason we must not accept what has come to appear to be a prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch." *Rodriguez,* 976 F.2d at 595–96 (emphasis omitted). Although law enforcement officials are entitled to assess the facts in light of their experience, " 'experience may not be used to give the officers unbridled discretion in making a stop.' " *Montero–Camargo,* 208 F.3d at

---

8. According to the Census Bureau, El Centro has a population of 39,453, Calexico has a population of 27,938, and Brawley (the only other city for which data are available) has a population of 23,075. *See* http://www.census.gov/population/estimates. However, the overall population of Imperial County, which is where these cities are located, is 144,051. See *Montero–Camargo,* 208 F.3d at 1133.

1131 (quoting *Nicacio v. INS* 797 F.2d 700, 705 (9th Cir.1985), *overruled in part on other grounds by Hodgers–Durgin v. de la Vina,* 199 F.3d 1037, 1045 (9th Cir.1999) (en banc)). Here, taking all of the factors into consideration—and excluding Defendant's appropriate reactions to Agent Wright's provocative and unsafe driving behavior and use of his lights—we are left with the following picture: A man driving a large pick up truck northbound on Highway 86 at 4:20 in the morning. That "profile" depicts "a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). As a result, the stop was unlawful. Because the stop was unlawful, the evidence obtained pursuant to the stop is tainted, "unless subsequent events have purged the taint." *United States v. Chavez–Valenzuela,* 268 F.3d 719, 727 (9th Cir. 2001), *amended by* 279 F.3d 1062 (9th Cir.2002); *see also United States v. Millan,* 36 F.3d 886, 890 (9th Cir.1994) (holding that evidence obtained as a result of an illegal stop must be suppressed). There is no such event here.

The district court erred in denying Defendant's motion to suppress all of the evidence obtained as a result of his being stopped by Agent Wright. The judgment of conviction is therefore reversed and the case is remanded for further proceedings.

**REVERSED and REMANDED.**