M. SMITH, Circuit Judge,
dissenting, with whom CLIFTON and CALLAHAN, Circuit Judges, join with respect to Part I:
I respectfully dissent. Until today, federal courts have consistently upheld suspi-cionless searches of electronic storage devices at the border. See United States v. Arnold, 533 F.3d 1003, 1008 (9th Cir.2008), cert. denied, 555 U.S. 1176, 129 S.Ct. 1312, 173 L.Ed.2d 595 (2009) (“[Reasonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices at the border.”); see also United States v. Ickes, 393 F.3d 501, 507 (4th Cir.2005) (no finding of reasonable suspicion required to search personal computers and disks at border); United States v. Linarez-Delgado, 259 Fed.Appx. 506, 508 (3d Cir.2007); United States v. McAuley, 563 F.Supp.2d 672, 677-78 (W.D.Tex.2008); United States v. Bunty, 617 F.Supp.2d 359, 365 (E.D.Pa.2008). Yet the majority ignores these cases, rewrites long standing Fourth Amendment jurisprudence, and, in narrowing Arnold, creates a circuit split.
While I share some of the majority’s concerns about the steady erosion of our personal privacy in this digital age, the majority’s decision to create a reasonable suspicion requirement for some property searches at the border so muddies current border search doctrine that border agents will be left to divine on an ad hoc basis whether a property search is sufficiently “comprehensive and intrusive” to require reasonable suspicion, or sufficiently “unintrusive” to come within the traditional border search exception. Requiring border patrol agents to determine that reasonable suspicion exists prior to performing a basic forensic examination of a laptop or other electronic devices discourages such searches, leaving our borders open to electronically savvy terrorists and criminals who may hereafter carry their equipment and data across our borders with little fear of detection. In fact, the majority opinion makes such a legal bouillabaisse out of the previously unambiguous border search doctrine, that I sincerely hope the Supreme Court will grant certiorari, and reverse the holding in this case regarding the level of suspicion necessary to search electronic devices at the border, for the sake of our national security, and the consistency of our national border search law.
The Supreme Court rejected our last attempt to narrow the border search exception, cautioning us not to create “complex balancing tests” for border searches of property except in the rarest of cases, where the search is “so destructive as to require” reasonable suspicion. United States v. Flores-Montano, 541 U.S. 149, 152, 156, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004) (rejecting our proposed reasonable suspicion requirement in United States v. Molina-Tarazon, 279 F.3d 709, 713-17 (9th Cir.2002)). “Time and again” the Court has concluded 'that border searches are “‘reasonable simply by virtue of the fact that they occur at the border.’ ” Id. at 152-53 (quoting United States v. Ramsey, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)).
Despite the Court’s clear ruling on the issue, the majority again seeks to whittle away at the border search exception, this time by conjuring a reasonable suspicion requirement for border searches that employ computer software to search an electronic storage device. Why the use of computer software to analyze a hard drive triggers a reasonable suspicion requirement while a “manual review” of the same hard drive requires no suspicion, is left unexplained. Although technology may *982 serve as a useful proxy for the intrusiveness of a search today, in the future even cursory searches might be more efficiently conducted by the use of such technology. Under the majority’s reasonable suspicion standard, individuals’ privacy rights are only as secure as the sophistication of the government’s current search mechanism.
Moreover, the task of distinguishing these “comprehensive and intrusive” laptop searches from the “unintrusive search” of a laptop affirmed in Arnold, 533 F.3d at 1008, or the search of a private letter affirmed in United States v. Seljan, 547 F.3d 993, 1003 (9th Cir.2008) (en banc), leaves border patrol officers with a difficult choice: either protect our nation from those who mean us harm, or risk their own jobs and livelihood in a Bivens action, or disciplinary proceedings. Apart from being administratively impractical, the majority’s reasonable suspicion requirement disregards well established border search jurisprudence, and undermines vital national security interests. Ironically, the majority did not even need to consider the border search doctrine in this case because the search at issue in this case did not occur at the border.
Separately, but importantly, the majority’s application of the reasonable suspicion requirement to Cotterman is also troubling. The majority purports to be concerned with travelers’ “personal privacy and dignity,” but its determination that reasonable suspicion exists under the exceedingly weak facts of this case undermines the liberties of U.S. citizens generally — not just at the border, and not just with regard to our digital data — but on every street corner, in every vehicle, and wherever else we rely on the doctrine of reasonable suspicion to safeguard our legitimate privacy interests.
I. The Border Search Doctrine
The majority heralds this as a “watershed” case that requires a narrowing of the border search exception to accommodate the privacy interests allegedly created by new technologies. Yet despite the majority’s attempts to avoid the fact, the border search exception is clear and inflexible. The Supreme Court has repeatedly affirmed the breadth of the border search doctrine, extending a reasonable suspicion requirement only to: (1) “highly intrusive searches of the person (2) “searches of property [that] are so destructive as to require” reasonable suspicion; and (3) searches carried out in a “particularly offensive manner” — of which the Court has yet to find an example. Flores-Montano, 541 U.S. at 152, 154 n. 2, 156, 124 S.Ct. 1582 (quotations and citations omitted) (emphasis added).
The majority misconstrues these narrowly-defined exceptions, reading FloresMontano to require reasonable suspicion whenever a search of property is deemed “overly intrusive.” Majority at 18-19. Yet, the exceptions articulated in FloresMontano are far more circumscribed — applying not to “overly intrusive” searches of property, like the search of Cotterman’s computer, but only to “highly intrusive searches of the person.” Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582 (emphasis added). The majority’s adoption of a reasonable suspicion requirement to “comprehensive forensic examination[s]” of property is irreconcilable with Flores-Montano. Majority at 956.
We have consistently rejected a reasonable suspicion requirement for border searches of expressive materials, such as papers and their modern-day equivalent— the data contained on electronic storage devices. See, e.g., Seljan, 547 F.3d at 1003 (“An envelope containing personal correspondence is not uniquely protected from *983 search at the border.”); Arnold, 533 F.3d at 1008 (“[Rjeasonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices at the border.”). The majority states that its en banc decision narrows Arnold to permit only “relatively simple” border searches of laptops, and “not to countenance suspicionless forensic examinations.” Majority at 14 n.6. In narrowing Arnold, however, the court creates a circuit split regarding the application of reasonable suspicion to border searches of electronic devices. See United States v. Ickes, 393 F.3d 501 (4th Cir.2005); see also United States v. Linarez-Delgado, 259 Fed.Appx. 506, 508 (3d Cir.2007).
For instance, in Ickes (as in Arnold) the defendant-appellant argued that a reasonable suspicion requirement was necessary for laptop searches at the border because otherwise “any person carrying a laptop computer [] on an international flight would be subject to a search of the files on the computer hard drive.” Ickes, 393 F.3d at 506-07. The Fourth Circuit rejected this argument, noting that
“[a]s a practical matter, computer searches are most likely to occur where — as here — the traveler’s conduct or the presence of other items in his possession suggest the need to search further. However, to state the probability that reasonable suspicions will give rise to more intrusive searches is afar cry from enthroning this notion as a matter of constitutional law. The essence of border search doctrine is a reliance upon the trained observations and judgments of customs officials, rather than upon constitutional requirements applied to the inapposite context of this sort of search”
Id. at 507 (emphasis added). The Third Circuit similarly rejected a reasonable suspicion requirement for border searches of electronic data, albeit in an unpublished opinion. See United States v. Linarez-Delgado, 259 Fed.Appx. 506, 508 (3d Cir.2007) (“Data storage media and electronic equipment, such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search”) (citing Ickes, 393 F.3d 501). Because the majority has narrowed our holding in Arnold that “reasonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices at the border,” Arnold, 533 F.3d at 1008, the Ninth Circuit stands alone, as it so often does.
The majority likens the search of Cotterman’s laptop to a “computer strip search,” Majority at 966, and proceeds to conflate the law regarding property searches with that regarding “highly intrusive searches of the person.” FloresMontano, 541 U.S. at 152, 124 S.Ct. 1582. However, the “reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person — dignity and privacy interests of the person being searched — simply do not carry over” to laptops, which know no dignity or shame, and thus have neither of those interests. Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582 (emphasis added). Moreover, even genuine strip searches do not necessarily require reasonable suspicion at the border. See United States v. Montoya de Hernandez, 473 U.S. 531, 541 n. 4, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (expressly declining to decide “what level of suspicion, if any, is required for ... strip, body cavity, or involuntary x-ray searches”) (emphasis added).
The majority’s decision to insulate electronic storage devices from the border search exception unsettles the border search doctrine, places inappropriate burdens on law enforcement, reduces deter *984 rence, and raises serious national security concerns. It also ignores the realities of electronic data transmission and the reduced privacy expectations that accompany much of this data, particularly at the border where “[t]he government’s interest in preventing the entry of unwanted persons and effects is at its zenith.” Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582.
A. Burdens on Law Enforcement
The majority’s holding cripples law enforcement at the border by depriving border patrol agents of the clear administrative guidance they need to carry out core law enforcement activities. “Officers who interact with those suspected of violating the law have an essential interest in readily administrable rules.” Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, - U.S. -, 132 S.Ct. 1510, 1522, 182 L.Ed.2d 566 (2012). Yet the majority’s holding requires border patrol agents to determine on a case-by-case and moment-by-moment basis whether a search of digital data remains “unintrusive,” a la Arnold, or has become “comprehensive and intrusive,” a la Cotterman. Majority at 960, 962. Requiring law enforcement to make such complex legal determinations on the spot, and in the face of potentially grave national security threats, strips agents of their necessary discretion and deprives them of an efficient and administrable rule.
The majority dismisses the burden its reasonable suspicion requirement places on law enforcement, asserting that agents can simply “draw on their expertise and experience” to make the necessary judgment calls. Majority at 967. Yet rather than actually deferring to this expertise and experience, the majority forces border patrol agents to justify their decisions under a heightened standard that has never before been applied to border searches of property.
Border patrol agents process hundreds of thousands of travelers each day and conduct thousands of searches on electronic devices each year.[1] Identifying national security and criminal threats at the border requires a high level of experience and discretion in order to recognize and respond to the ever-changing tactics of those who seek to enter our country with nefarious intent. In recognition of these crucial interests, the border search exception provides law enforcement with broad discretion to conduct border searches of property without resorting to case-by-case determinations of reasonable suspicion— determinations border patrol agents are ill-equipped to handle. See generally Florence, 132 S.Ct. at 1522 (rejecting reasonable suspicion requirement for prison strip-searches under this rationale). Moreover, as a practical matter, suspicion-less border searches of property make sense, in light of the sheer number of individuals crossing the border with electronic devices each day. See United States v. Martinez-Fuerte, 428 U.S. 543, 557, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (requiring reasonable suspicion for vehicle checkpoints near the Mexican border “would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car”). Given these realities of law enforcement at the border, a reasonable suspicion requirement for all “overly intrusive” electronic searches is simply not practicable.
B. National Security Concerns
The majority’s decision to insulate electronic devices from search at the border creates serious national security concerns. An “ever present threat exists from the *985 potential for terrorists to employ the same smuggling and transportation networks, infrastructure, drop houses, and other support” as other illegal aliens. U.S. Customs and Border Protection, National Border Patrol Strategy 5 (2005). The Department of Homeland Security has found that border searches of electronic storage devices are “essential” for “detect[ing] evidence relating to terrorism and other national security matters.”[2] Terrorists rely on electronic storage devices, for example, to copy and alter passports and other travel documents.[3] By providing special privacy protections for electronic devices at the border, the majority eliminates the powerful deterrent of suspicionless searches and significantly aids technologically savvy terrorists and criminals who rely on encryption and other surreptitious forms of data storage in their efforts to do harm. See Martinez-Fuerte, 428 U.S. at 557, 96 S.Ct. 3074 (rejecting reasonable suspicion requirement for vehicle checkpoints near the Mexican border because to hold otherwise “would largely eliminate any deterrent to the conduct of well-disguised smuggling operations”).
The majority contends that the goal of deterrence does not justify “any manner of intrusive search” at the border. Majority at 967. Although I certainly agree with the majority that a policy objective like deterrence cannot justify an otherwise unconstitutional “highly intrusive search[ ] of the person ” at the border, Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582, the crucial role of deterrence cannot, and should not, be understated. In fact, the Supreme Court recently affirmed the importance of deterrence in upholding suspi-cionless strip searches — the apotheosis of an intrusive search. Florence, 132 S.Ct. at 1516 (rejecting reasonable suspicion requirement for prison strip searches and reasoning that “deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions”). The suspicionless strip search upheld in Florence, which included a close visual inspection of “the buttocks or genital areas,” was unquestionably more intrusive than the so-called “computer strip search” at issue here. Id. at 1515.
The majority contends that the deterrence function of suspicionless searches will not be hampered by the requirement of reasonable suspicion because, “as a matter of commonsense and resources, it is only when reasonable suspicion is aroused that such searches typically take place.” Majority at 967 n. 14. This is, of course, the very argument rejected by the Fourth Circuit in lakes. See Ickes, 393 F.3d at 507 (“As a practical matter, computer searches are most likely to occur where— as here — the traveler’s conduct or the presence of other items in his possession suggest the need to search further. However, to state the probability that reasonable suspicions will give rise to more intrusive searches is a far cry from enthroning this notion as a matter of constitutional law”).
In addition to undermining deterrence, a reasonable suspicion requirement will likely disincentivize agents to conduct laptop searches in close cases. See Florence, 132 S.Ct. at 1522 (“To avoid liability” if required to find reasonable suspicion, “officers might be inclined not to conduct a thorough search in any close case, thus creating unnecessary risk for the entire jail population.”). Border patrol agents *986 accused of conducting an “unreasonable” search face very real consequences — as federal officials, for example, they may be sued in their individual capacities for civil damages, as part of a Bivens[4] action. See Ronald J. Sievert, Meeting the Twenty-First Century Terrorist Threat Within the Scope of Twentieth Century Constitutional Law, 37 Hous. L.Rev. 1421, 1424 (2000). The majority’s reasonable suspicion requirement saddles border patrol agents with a “Sophie’s choice” between securing our nation, and protecting their own livelihoods. These misaligned incentives create unnecessary risk, not just for a prison population, as in Florence, 182 S.Ct. at 1522, but for our entire nation.
Cl Expectation of Privacy in Electronic Data at the Border
The majority suggests that travelers at the border have a heightened expectation of privacy in their electronic storage devices, due to the “uniquely sensitive nature of [this] data.” Majority at 966. There is no question that searches of electronic data are protected by the Fourth Amendment, but we have never found this data to be immune from the border search exception. In fact, these electronic storage devices are hardly a bastion of privacy. When connected to the Internet, they transmit a massive amount of intimate data to the public on an almost constant basis, rendering it unremarkable that they can be searched at the border, where “[t]he government’s interest in preventing the entry of unwanted persons and effects-is at its zenith.” Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582.
Indeed, Facebook, for example, now has more than 500 million users, who share more than 25 billion pieces of data each month.[5] Those who opt out of social networking sites are no less susceptible to the ubiquitous Internet cookie, which collects data on users’ Internet activities to share or sell with other organizations. Max Stul Oppenheimer, Consent Revisited, 13 No. 12 J. Internet L. 3, 4 (2010). Until recently, a federally funded data accumulation system allowed clients to “search tens of billions of data records on individuals and businesses in mere seconds.”[6] Considering the steady erosion of our privacy on the Internet, searches of electronic storage devices may be increasingly akin to a well-placed Internet search. Ironically, the majority creates a zone of privacy in electronic devices at the border that is potentially greater than that afforded the Google searches we perform in our own homes, and elsewhere.
The majority muses that “[a] person’s digital life ought not be hijacked simply by crossing the border,” Majority at 22, but it fails to explain why electronic data deserves special protections when we have never extended such protections to the same data in written form. See Seljan, 547 F.3d at 1003 (“An envelope containing personal correspondence is not uniquely protected from search at the border.”); see also United States v. Tsai, 282 F.3d 690, 696 (9th Cir.2002) (no reasonable suspicion needed to search a traveler’s briefcase); United States v. Grayson, 597 F.2d *987 1225, 1228-29 (9th Cir.1979) (no reasonable suspicion needed to search papers found in a shirt pocket); Henderson v. United States, 390 F.2d 805, 808 (9th Cir.1967) (no reasonable suspicion needed to search a traveler’s “purse, wallet, or pockets”). The documents carried on today’s smart phones and laptops are different only in form, but not in substance, from yesterday’s papers, carried in briefcases and wallets. The majority contends that electronic devices hold data of a “uniquely sensitive nature” and that, inexplicably, these devices have the “capability to ... augment the expectation of privacy.” Majority at 965, 966. Under the majority’s reasoning, the mere process of digitalizing our diaries and work documents somehow increases the “sensitive nature” of the data therein, providing travelers with a greater expectation of privacy in a diary that happens to be produced on an iPad rather than a legal pad. Such artificial and arbitrary distinctions cannot serve as a reasonable basis for determining privacy rights at the border.
The majority attempts to distinguish electronic devices from papers by the vast amount of data they can hold, noting that “[a] car full of packed suitcases ... cannot hold a candle to the sheer, and ever-increasing, capacity of digital storage.” Majority at 964. Yet, “case law does not support a finding that a search which occurs in an otherwise ordinary manner, is ‘particularly offensive’ simply due to the storage capacity of the object being searched.” Arnold, 533 F.3d at 1010. The majority contends that it “discuss[es] the typical storage capacity of electronic devices simply to highlight the features that generally distinguish them from traditional baggage.” Majority at 964 n. 10. Yet why the majority would bother to distinguish between the storage capacities of electronic devices and traditional luggage is a mystery, unless to support its enhanced protections for electronic devices based on their greater storage capacity.
Mapping our privacy rights by the amount of information we carry with us leads to unreasonable and absurd results. Under the majority’s reasoning, a Mini Cooper filled with documents is entitled to less privacy protection at the border than a stretch Rolls-Royce filled with documents; a pickup truck filled with documents is entitled to less protection than an 18 wheeler filled with documents. It appears that those who cannot afford a 64 gigabyte iPad, or the “average” 400 gigabyte hard drive discussed by the majority, Majority at 964, will alone be subject to suspicionless searches. The majority’s reasoning also protects the rich (who can generally afford more sophisticated devices) to a greater extent than the poor (who are presumably less able to afford those more capable devices.) See United States v. Ross, 456 U.S. 798, 822, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (“[A] traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf claim[s] an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attache case.”).
If our privacy interests are to be dictated by the quantity of data we possess, the question then becomes, how many gigabytes of storage must one buy to secure the guarantee that reasonable suspicion will be required before one’s devices are searched? The majority gives us no firm basis for deciding how much storage space is necessary — 32 gigabytes? 64 gigabytes? 400 gigabytes? Who knows? Moreover, the majority’s test must constantly change to accommodate the ever-increasing capacity of electronic storage and new technologies. Before we know it, today’s “average” 400 gigabyte hard drive will look like *988 yesterday’s diary next to tomorrow’s “average” 2 terabyte hard drive.
The majority asserts that our “reasonableness determination must account for differences in property.” Majority at 966. This assertion has no basis in law, however, since Flores-Montano distinguished not between types of property, but between searches of property and “searches of the person.” Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582 (emphasis added). In any event, it appears that the majority’s reasonableness requirement accounts not for “differences in property,” as it suggests, but rather for differences in the intrusiveness of a particular property search. As discussed supra, however, these intrusiveness-based tests have no place in border searches of property and have been explicitly rejected by the Supreme Court as “[c]omplex balancing tests.” Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582.
The majority additionally speculates about the privacy implications of searching an external cloud platform, which may “includ[e] the same kind of highly sensitive data one would have in ‘papers’ at home.” Majority at 965. I share the majority’s keen interest in the Fourth Amendment implications of this burgeoning technology, but the reasonableness of cloud computing has no bearing on the case at hand, absent any facts that Cotterman utilized such a platform, or that such a platform was searched.
II. Waiver
There is another important issue in this case that is separate from the majority’s new standard for border searches. Specifically, I refer to the majority’s finding that there was reasonable suspicion to search Cotterman’s computer and other electronic devices, miles from the border. In its zeal to cripple the application of the current border search doctrine, while still securing Cotterman’s conviction, the majority turns on their heads all the parties’ arguments about reasonable suspicion as to Cotter-man, and the findings made by the lower courts concerning that suspicion. First, the majority now stakes its holding on a finding of reasonable suspicion — despite the fact that the government knowingly and unequivocally conceded on appeal any argument that the computer search was supported by reasonable suspicion. Second, the majority’s determination that reasonable suspicion was required under the border search exception is contrary to every argument raised by either party in its briefs pnor to our request for supplemental briefing. Third, even the majority seems to concede that the search of Cotterman’s own computer that actually occurred at the border did not involve a computer with sufficient storage capacity, and was not sufficiently intrusive, to require reasonable suspicion, under its “new” border search doctrine. Thus, it need not have treated, nor altered, the current border search exception. Fourth, the Magistrate Judge’s Report and Recommendation, adopted by the District Judge, did not conclude that reasonable suspicion was required under the border search exception. Despite all the above, the majority upholds Cotterman’s conviction on grounds that the government had reasonable suspicion to extensively search his computer 170 miles from the border. Being mindful that the government has the burden of proof in this case, not the majority of our panel, I would have heeded the government’s strategic, good faith decision to abandon on appeal its argument that reasonable suspicion existed.[7]
*989 The majority claims that Cotterman has not been prejudiced — despite the fact that the majority’s finding of reasonable suspicion is the raison d’etre for his conviction — because Cotterman was allowed to file a supplemental brief on the matter after oral argument. Although I concede that what the majority did is technically permissible, see U.S. Nat’l Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 446, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (“When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law”) (citations and quotations omitted), it is clear to me that Cotterman has been severely prejudiced, because his conviction is based solely on an issue the government conceded, and that Appellant, and the lower courts, took for granted because it was not needed for a border search. It is the majority of our panel, not the government, that prosecuted the reasonable suspicion issue in this case.
III. Extended Border Search
The extended border search doctrine applies to “searches that do not occur at the time of entry or in the immediate vicinity of the border.” United States v. Alfonso, 759 F.2d 728, 735 (9th Cir.1985). Because these searches “intrude more on an individual’s normal expectation of privacy,” reasonable suspicion is required. Id. at 734.
The majority’s mutation of the border search exception is especially unnecessary given that this search did not occur at the border, but rather 170 miles away from the border and five days after the border was crossed. Indeed, the majority concedes that the government could have performed the forensic computer search at the border, but instead chose to transport Cotter-man’s electronics more than 170 miles away. By labeling this a border search, the majority has conjured a sort of “floating border,” whereby any item initially seized at the border, but not cleared there, can be transported thousands of miles away and searched anywhere, and at any time, simply because the government did not find anything (or enough) during its original search at the border. Because the search at issue occurred neither “at the time of entry or in the immediate vicinity of the border,” it is more appropriately analyzed as an extended border search. See Alfonso, 759 F.2d at 735.
The majority asserts that this case cannot be analyzed as an extended border search because Cotterman’s computer was never “cleared” at the border prior to search. Majority at 961. The majority is mistaken. In United States v. Cardona, 769 F.2d 625, 628 (9th Cir.1985), we applied the extended border search doctrine to a search of a Federal Express package that occurred twenty-four hours before the scheduled border crossing, and 3,000 miles from the border. See 769 F.2d at 628 (“Considering the distance and time factors of the present case, we conclude that the facts of this case should be analyzed under the extended border search doctrine.”).
While this case presents issues we have not yet addressed in the context of an extended border search, United States v. Alfonso is squarely on point. In Alfonso, the government conducted an initial, cursory search of a ship upon its arrival at the Los Angeles harbor. Alfonso, 759 F.2d at 732. Thirty-six hours later, while still docked at the port, officials conducted a second, more intrusive search. Id. Tasked *990 with determining whether the second search was an extended border search or a search at the functional equivalent of the border, we noted that “the instant case illustrates the difficulty of making sharp distinctions in this area.” Id. at 735. We determined that “[although we have no difficulty in relating this site with the border, we shall, because of the time factor— the lapse of thirty-six hours in conducting the searches — examine the facts under the rules of extended border search.” Id. at 734. The majority suggests that cases like Alfonso are distinguishable from the case at issue because those cases wrestled with distinguishing between a functional border search and an extended border search, whereas this case involves distinguishing between a traditional border search and an extended border search. This is a distinction without a difference since, as the majority acknowledges, there is no operative difference between border searches and searches that occur at the functional equivalent of the border, at least for purposes of determining whether a search is an extended border search.
I would hold that the search which took place 170 miles from the border, five days after crossing — a much greater lapse than the thirty-six hours in Alfonso — requires this case to be analyzed as an extended border search. Additionally, the reasonable suspicion requirement already applies to extended border searches, in recognition of the fact that such searches “intrude more on an individual’s normal expectation of privacy.” Id. As such, the extended border search doctrine is aptly suited to address the privacy expectations at issue in this case.
IY. Reasonable Suspicion
Irrespective of the government’s concession of the issue, the evidence in this case falls woefully short of reasonable suspicion. “[RJeasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion.” United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir.2000) (en banc). We assess reasonable suspicion under the totality of the circumstances, “takfing] into account both factors weighing for and against reasonable suspicion.” United States v. Manzo-Jurado, 457 F.3d 928, 938 (9th Cir.2006). We “will defer to officers’ inferences only when such inferences rationally explain how the objective circumstances ‘aroused a reasonable suspicion that the particular person being stopped had committed or was about to commit a crime.’ ” Manzo-Jurado, 457 F.3d at 934-35 (quoting Montero-Camargo, 208 F.3d at 1129) (alterations omitted). “Reasonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.” United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1121 (9th Cir.2001) (internal quotations and citations omitted).
I agree with the majority that reasonable suspicion was not needed to conduct the initial search of Cotterman’s computer at the border, and that we analyze reasonable suspicion only as to the second search (the majority would say a continuation of the initial search,) which took place 170 miles from the border and several days after the border crossing. The majority’s reasonable suspicion finding appears to be based solely on the TECS alert: it states that “the nature of the alert on Cotterman, directing agents to review media and electronic equipment for child pornography, justified conducting the forensic examination despite the failure of the first search to yield any contraband.” Majority at 33. Thus, the majority pins reasonable suspicion on the TECS alert, dismisses out of *991 hand the numerous factors weighing against reasonable suspicion, and paves the way for a government database to target “entire categories of people without any individualized suspicion of the particular person to be stopped.” Sigmond-Ballesteros, 285 F.3d at 1121 (internal quotations and citations omitted) (emphasis added). The majority considers the TECS alert to be a sufficient basis for reasonable suspicion, but in reality, it is nothing more than a mechanism that automatically flags all individuals who are registered sex offenders in California — no matter the nature of the sex offense or how old the conviction — who travel frequently.[8] California is home to more than 106,000 sex offenders.[9] Some of these individuals are required to register as sex offenders for life. Depending on how many of them travel frequently, a TECS hit could affect tens of thousands of Californians — many with decades-old convictions. The TECS database clearly hits on “a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.” Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). By allowing reasonable suspicion to rest entirely on the TECS alert, the majority rules that a decades-old conviction can serve as a basis to deprive a person of his or her property for an indefinite period, so that a “border search” may be conducted hundreds of miles from the border.
The majority suggests that the TECS alert informed border patrol agents of the nature of Cotterman’s conviction. In fact, the TECS hit did not state the nature of Cotterman’s conviction, although one agent mistakenly recollected that “it stated that [Cotterman] appeared to [sic] been involved in some type of child pornography.” Curiously, another agent stated that a criminal history check on Cotterman revealed that “that he had a prior conviction pertaining to child pornography.” In fact, and despite the erroneous contentions of the referenced agents, Cotterman had no prior child pornography conviction; he had a 15-year-old conviction for sexual conduct with a minor. While we generally give “due weight to inferences drawn” by law enforcement, Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the case for deference is questionable here in the absence of any rational explanation as to how the officers could have read the TECS alert and criminal history check, neither of which listed a conviction for child pornography, and come away thinking that Cotterman was guilty of that offense. See Manzo-Jurado, 457 F.3d at 934-35 (“[W]e will defer to officers’ inferences only when such inferences rationally explain how the objective circumstances aroused a reasonable suspicion.”); see also Liberal v. Estrada, 632 F.3d 1064, 1078 (9th Cir.2011) (mistake of fact must be reasonable).
All things considered, the fact that an individual with a 15-year-old sex convic *992 tion was also a frequent traveler appears to be a rather weak lynchpin for reasonable suspicion. Yet, other than Cotter-man’s prior conviction and travels, the factors cited by the majority are far too generalized to provide even an indicia of suspicion that Cotterman was involved in sex tourism. For instance, the majority considers Cotterman’s “collection of electronic equipment” to be a factor supporting reasonable suspicion. In today’s world, the fact that Cotterman and his wife each carried a laptop and digital camera when traveling internationally, as well as one video camera between them,[10] is no more evidence of “sex tourism” than of any other kind of tourism.
Similarly, the fact that Cotterman was returning from Mexico fails to support a finding of reasonable suspicion. Mexico is a popular travel destination for Californians, including those who travel to Mexico for its beaches, culture and weather, and not for its sex tourism. Travel to Mexico simply does not support reasonable suspicion without more specific evidence that Cotterman traveled to a particular establishment, city, or even region, associated with sex tourism. See United States v. Irving, 452 F.3d 110, 114, 124 (2d Cir.2006) (finding reasonable suspicion based on knowledge that suspect, a convicted pedophile and the subject of criminal investigation, had visited an orphanage in Mexico and had luggage with children’s books and drawings). According to the Department of Justice, American sex tourism is a problem not only in Mexico, but also in Southeast Asia, Central and South America, and, to a lesser extent, Eastern Europe.[11] Under the majority’s application of reasonable suspicion, an individual who committed a sex offense 30 years ago cannot visit the Charles Bridge in Prague, the Cristo Redentor in Rio de Janeiro, or even the “lost city” of Machu Picchu, without arousing a “reasonable” suspicion of sex tourism. Someone who was convicted of tax evasion 15 years ago, or any other kind of conviction listed on a federal database, and particularly one that involved the use of a computer, should also probably avoid visiting Switzerland or Luxemburg under the majority’s new standard. The bottom line is that thousands of individuals — many with decades-old convictions — will now be forced to reconsider traveling to entire countries or even continents, or will need to leave all their electronic equipment behind, to avoid arousing a “reasonable” suspicion.
Perhaps the most concerning aspect of the majority’s opinion, especially given its stated stance on privacy rights at the border, is its readiness to strip former sex offenders and others convicted of past crimes (and who are, theoretically, entitled to be presumption of innocence) of even the most basic of privacy rights, such as the right to password-protect their electronic devices. The majority acknowledges that “it is commonplace for business travelers, casual computer users, students and others to password protect their files” and that “password protection is ubiquitous.” Majority at 970. It avers that “[njational standards require that users of mobile electronic devices password protect them files,” and that “[cjomputer users are routinely advised — and in some cases, required by employers — to protect their files when traveling overseas.” Majority at 31 (emphasis added). Yet because border patrol agents encountered a single password- *993 protected file on Cotterman’s computer, the majority considers password protection a factor contributing to reasonable suspicion.[12] Worse still, the majority contends that it is justified in considering the password-protected file because “making illegal files difficult to access makes perfect sense for a suspected holder of child pornography.” Majority at 969. I fail to see how the agents had reasonable suspicion that Cotterman’s computer contained “illegal files” based solely on his 15-year-old sex offense, travel to Mexico with his wife, and the “ubiquitous” act of password-protection. Indeed, as the majority acknowledges, making legal files difficult to access makes “perfect sense” for anyone, even former sex offenders.
I would find a password-protected file to be not at all suspicious, unless we want to start basing reasonable suspicion on locked diaries and briefcases. Registered sex offenders face numerous consequences as a result of their convictions, but the law has never before punished them for using “ubiquitous” and “commonplace” password-protection. Yet under the majority’s analysis, an individual traveling to Southeast Asia for business, who happens to be subject to one of TECS’s broad-based alerts, and who follows his company’s security protocols, should expect to have his electronic equipment seized and transported hundreds of miles away.[13]
Moreover, the majority fails to consider reasonable suspicion in light of the totality of the circumstances because it dismisses without explanation numerous factors that weigh against a finding of reasonable suspicion in this case. See Manzo-Jurado, 457 F.3d at 938 (the reasonable suspicion determination must “take[] into account both factors weighing for and against reasonable suspicion.”) (emphasis added). At the time the border patrol agents commenced the second search, 170 miles away from the border, any suspicions they may have initially harbored against Cotterman would have been largely addressed by their interrogations of Cotterman and his wife, which produced nothing suspicious. An initial search of Cotterman’s computer and the digital cameras turned up nothing more than a single password protected file and photos of “whale hunting and various excursions,” all of which corroborated Cot-terman’s story about vacationing in Mexico. Also during this initial search, one of the border patrol agents did a records check and discovered that Cotterman’s conviction for the sex offense had occurred more than 15 years ago. Cotterman was fully cooperative and even offered to help the agents access his computer. The majority contends that Cotterman’s offer to help does not weigh against a finding of reasonable suspicion because the agents declined Cotterman’s offer based on the possibility — however slight — that Cotter-man could “booby trap” the devices. That the agents were unable to accept Cotter-man’s offer, however, does not change the reasonable inference that his offer was a genuine one.
Accordingly, it is irrelevant whether there was reasonable suspicion for the ini *994 tial search, because I agree with the majority that reasonable suspicion was not required. The relevant inquiry here is what suspicion existed after all of Cotter-man’s electronics were searched, and he and his wife were interrogated separately, and every piece of evidence obtained corroborated the Cottermans’ story about vacationing in Mexico. The only hint of suspicion remaining at that point — after the initial border search and interrogations— was the single password-protected file, which I agree with the majority is insufficient, by itself, to sustain a finding of reasonable suspicion. See Manzo-Jurado, 457 F.3d at 935 (“[T]o establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population.”).
Y. Conclusion
Reasonable suspicion has no place in property searches at the border, as the Supreme Court has consistently held. See Flores-Montano, 541 U.S. at 152-53, 124 S.Ct. 1582 (“Time and time again, we have stated that searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border”). Imposing a reasonable suspicion requirement here forces courts and border patrol agents to engage in just the “sort of decision-making process that the Supreme Court wished to avoid in sanctioning expansive border searches.” Seljan, 547 F.3d at 1011 (citation omitted) (Callahan, J. concurring). Rather than rewrite the border search exception, as the majority does, I would affirm the district court’s application of the extended border search doctrine to Cotterman’s case, which appears most appropriate given the extensive lapse in distance and time between the first and the second search. Additionally, I would hold the government to its burden of proof in determining that reasonable suspicion was absent here. Under the doctrine of this case, the majority sweeps in thousands of innocent individuals whose electronic equipment can now be taken away from the border and searched indefinitely, under the border search exception.
I respectfully dissent.

. Department of Homeland Security Privacy Office, Annual Report to Congress 54 (2009).

. U.S. Customs and Border Protection, Border Search of Electronic Devices Containing Information, CBP Directive No. 3340-049 § 1 (2009).

. Thomas R. Eldridge, et at, 9/11 and Terrorist Travel: Staff Report of the National Commission on Terrorist Attacks Upon the United States 60 (2004).

. Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

. Jeffrey Rosen, The Deciders: Facebook, Google, and the Future of Privacy and Free Speech, in Constitution 3.0: Freedom and Technological Change (Constitution 3.0) 76 (Jeffrey Rosen & Benjamin Wittes eds., Brookings Institution Press 2011).

.Christopher Slobogin, Is the Fourth Amendment Relevant?, in Constitution 3.0 18 (citing Laura K. Donohue, Anglo-American Privacy and Surveillance, 96 J.Crim. L. & Criminology 1059, 1150-51 (2006)).

. When asked during oral argument why it failed to argue reasonable suspicion on ap *989 peal, the government acknowledged that the issue was a “close” one.

. The TECS alert is part of Operation Angel Watch, a program that targets California residents who are registered sex offenders based on the suspicion that those individuals who travel internationally are engaging in child sex tourism. The majority at one point improperly lists “the parameters of the Operation Angel Watch program” as an independent factor supporting reasonable suspicion. Majority at 968-69. We must look solely at the underlying facts supporting reasonable suspicion — i.e., Cotterman's status as a sex offender and his frequent travel — rather than the database or mechanisms used to deliver that information.

. Press Release, National Center for Missing and Exploited Children, Number of Registered Sex Offenders in the U.S. Nears Three-Quarters of a Million (Jan. 23, 2012).

. The video camera was apparently Mrs. Cotterman's.

. U.S. Department of Justice, The National Strategy for Child Exploitation Prevention and Interdiction, A Report to Congress 36 (2010).

. The unequivocal testimony of Agent Antonio Alvarado confirms that only a single password-protected file was discovered on Cotter-man’s computer at the border.

. The majority finds ironic my concern about the expansiveness of its reasonable suspicion standard, since at the border, I would advocate for no suspicion at all. The majority is correct that at the border, my concern is simply with following Flores-Montano and maintaining national security. I view the majority's application of its reasonable suspicion requirement as a separate issue, and my concern there is that the majority has so diluted the reasonable suspicion requirement as to undermine the rights of U.S. citizens generally-