Fernando M. Olguin, United States District Judge
Having reviewed and considered all the briefing filed with respect to defendant Timothy Lewis's ("defendant" or "Lewis") Motion to Suppress Evidence (Dkt. 22, "Motion"), and the testimony and evidence presented during the evidentiary hearing held on June 2, 2017, the court concludes as follows.
BACKGROUND
On January 18, 2017, a federal grand jury indicted Lewis on charges for being a felon in possession of a firearm and with illegally transporting firearms in violation of 18 U.S.C. §§ 922(a)(3) & (g)(1). The charges result from a stop and search of defendant's vehicle by agents from the United States Customs and Border Protection ("CBP") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). (See Dkt. 22, Motion at 3). In his Motion, defendant seeks to suppress evidence discovered during the traffic stop, arguing that the stop was not supported by reasonable suspicion and the warrantless search of his vehicle was not supported by probable cause. (See id. at 3, 10-17 & 18).
At approximately 11:00 a.m. on December 7, 2016, Lewis drove a red Mazda CX-5 sports utility vehicle ("the Mazda") into a Flying J service station in Ehrenberg, Arizona. (See Dkt. 26, Declaration of Rafael De Leon ("De Leon Decl.") at ¶ 6); Dkt. 22-1, Exhibit A to Motion, Border Patrol Report of Apprehension or Seizure ("Report") at 5). Ehrenberg, Arizona is located approximately 100 "air miles" from the border between the United States and Mexico. (See Dkt. 60, Transcript at 19). The Flying J is used frequently by CBP agents to purchase fuel and food or drinks. (See Dkt. 26, De Leon Decl. at ¶ 8).
CBP Agent Rafael De Leon ("De Leon") was at the Flying J station when defendant arrived. (See Dkt. 26, De Leon Decl. at ¶¶ 6 & 8-9). Defendant was accompanied by one passenger, Todd Lewis, who was riding in the front passenger seat. (See Dkt. 22, Declaration of Timothy Lewis ("Lewis Decl.") at ¶ 1). Defendant and Todd Lewis are both African-American males. (See id.; Dkt. 60, Transcript at 57). On the date of the stop, defendant had his hair in dreadlocks. (See Dkt. 22, Lewis Decl. at ¶ 1).
De Leon has been a CBP agent for approximately 15 years and is assigned to the CBP Station in Blythe, California. (See Dkt. 26, De Leon Decl. at ¶¶ 1-2). He has experience and training in "immigration and customs law, smuggling law, international boundaries crossings, narcotics, and procedures for conducting vehicle stops." (Id. at ¶ 2). Since October 2016, De Leon has "performed collateral duties in an interdiction group known as the Blythe Alien Narcotic Detection and Interdiction Team *1106 ('BANDIT')". (See id. at ¶ 3). BANDIT is tasked with conducting targeted enforcement and anti-smuggling operations in areas surrounding El Centro and Indio, California, Gila Bend, Arizona, and northward to the Utah border. (Id. at ¶ 4).
De Leon first saw the Mazda as it approached a fuel pump at the Flying J. (See Dkt. 60, Transcript at 19). De Leon described the Mazda as a newer model, with California plates, no tinted windows, and a barcode sticker on the driver's side window which "was consistent with those found on rental vehicles." (See Dkt. 26, De Leon Decl. at ¶ 6). According to De Leon, "rental cars are often used in the transportation of undocumented aliens and contraband in an attempt to minimize los[s]es if [smugglers] run into law enforcement." (Id. at ¶ 7). Also, in De Leon's experience, smugglers stop at the Flying J gas station to "stage" crossings into California, meaning that "scouts will [ ] go to the Flying J to observe Border Patrol agents[ and] then notify smugglers when" the area is clear of law enforcement. (Id. ).
De Leon watched Lewis as he parked, exited the vehicle, and as he walked by De Leon into the station. (See Dkt. 60, Transcript at 24). According to De Leon, defendant noticed De Leon's marked CBP patrol vehicle as he walked into the station.[1] (See Dkt. 26, De Leon Decl. at ¶ 9). When defendant passed De Leon, who was dressed in his uniform and equipped with a visible gun holster, defendant "put his head down, and quickly walked inside the store." (Id. at ¶ 10). This struck De Leon as odd because, "usually at Flying J, most [people] will come by[ and say] how you doing, sir, you know, good morning, you know, thanks for your service, stuff like that." (Dkt. 60, Transcript at 82). De Leon eventually left the Flying J, and drove onto the access road connecting to the Interstate 10 ("I-10").[2] (See id. at 29-33). However, De Leon "slow rolled" down the access road so that he "could keep [a] visual on [defendant.]" (Id. at 34).
De Leon drove a short distance on the I-10 across the border into California and parked just west of a California Agricultural Inspection Station ("CAIS"), where he waited "for the Mazda to pass to get a better look." (See Dkt. 26, De Leon Decl. at ¶ 11; Dkt. 60, Transcript at 26-27). De Leon claims he could get a good look at the Mazda from this vantage point, because vehicles are forced to pass through the CAIS and come "to a complete stop before entering California." (See Dkt. 26, De Leon Decl. at ¶ 12). De Leon was parked at the CAIS in the median of the I-10 just south of the westbound lanes and just north of the eastbound lanes. (See Dkt. 60, Transcript at 89). CBP Agents Eric Wilson ("Wilson") and Victor Herrera ("Herrera") were parked next to De Leon in another CBP service vehicle. (See Dkt. 26, Wilson Decl. at ¶¶ 4 & 7).
At approximately 11:30 a.m., the Mazda, with defendant still driving, passed through the CAIS in the lane closest to where De Leon was parked, i.e., in the far left-hand lane of the three westbound lanes. (See Dkt. 60, Transcript at 37-39 & 89-90; Dkt. 26, Wilson Decl. at ¶ 6). According *1107 to De Leon, as the Mazda passed in front of his vehicle, Lewis was reclined in his seat making it difficult to see him. (See Dkt. 26, De Leon Decl. at ¶ 13). De Leon asserts that defendant "appeared to tense up his upper body as he passed" and "tilted his head slightly down and to the right[,] away from [him] and merging traffic[.]"[3] (Id. ). De Leon stated that this caught his attention, "as it was not normal behavior for passing motorists." (Id. ).
De Leon then decided to pursue the Mazda "for further observation." (See Dkt. 26, De Leon Decl. at ¶ 14). Because the Mazda had "a little bit of a head start," De Leon had to drive faster than the 70 miles per hour speed limit on the I-10 to catch up to it. (See id. at ¶ 15; Dkt. 60, Transcript at 42). Though he doesn't recall his exact speed, De Leon estimated that he was traveling somewhere in excess of 80, possibly up to 100 miles per hour. (See Dkt. 60, Transcript at 42-43). According to De Leon, when he caught up to the Mazda, the car was traveling over 80 miles per hour, (see Dkt. 26, De Leon Decl. at ¶ 15), and was in the left-hand westbound lane of the two-lane highway. (See Dkt. 60, Transcript at 50). Lewis testified that he was traveling with the flow of traffic, which was over 70 miles per hour. (See id. at 94).
De Leon does not recall exactly how close he got to the Mazda when he eventually caught up to it. (See Dkt. 60, Transcript at 50-51; Dkt. 26, De Leon Decl. at ¶ 15). Lewis states that De Leon "was traveling noticeably faster than [him], gaining ground on [him] quickly" and that "Agent De Leon drove his vehicle very close to [his], and tailgated [him], but did not immediately turn on his lights to stop [him] and did not pass [him]." (Dkt. 22, Lewis Decl. at ¶ 5). In his declaration, De Leon stated that as he was approaching the Mazda, Lewis "could not pick a lane in which to travel" and that he "continuously swerved from the left lane to the right lane" and also drove "in the middle of two lanes for about a quarter of a mile." (Dkt. 26, De Leon Decl. at ¶ 16). At the evidentiary hearing, however, De Leon testified that as he approached the Mazda, Lewis was not "weaving in and out" of traffic or from lane to lane, or suddenly changing speeds. (See Dkt. 60, Transcript at 50-51 & 54-55). De Leon also testified that Lewis did not attempt to evade him by exiting the I-10, and that Lewis did not increase his speed but "actually started slowing down." (See id. at 54-55).
At some point after De Leon caught up with Lewis, the Mazda changed lanes from the left lane to the right lane. (See Dkt. 26, De Leon Decl. at ¶ 16; Dkt. 22, Lewis Decl. at ¶ 6). Defendant states that when he saw the CBP vehicle behind him, he slowed down and moved to the right lane to allow the agent to pass him. (Dkt. 22, Lewis Decl. at ¶ 6). According to De Leon, "this is another tactic used by smugglers hoping that Border Patrol agents will pass them." (See Dkt. 26, De Leon Decl. at ¶ 15). After moving into the right lane, defendant found himself behind a large, slow-moving truck which caused him to "slow[ ] down more." (Dkt. 22, Lewis Decl. at ¶ 6). De Leon more or less corroborated Lewis's testimony, stating that he was "pretty sure" there was a large truck or another vehicle in front of defendant in the right-hand lane which was driving slower than defendant. (See Dkt. 60, Transcript at 85). Defendant states that "[w]hen the agent switched lanes to stay behind [him], but also did not turn on his lights to pull [him] over, [he] was not sure what to do. [He]
*1108 was unsure whether [he] should stay in the right lane behind the truck, or switch lanes, speed up, and pass the truck." (Dkt. 22, Lewis Decl. at ¶ 6). By this point, De Leon had reduced his speed to about 50 miles per hour "in order to match the speed of the Mazda." (Dkt. 26, De Leon Decl. at ¶ 17). During this time, De Leon was trying to determine if there was somebody in the passenger seat. (See id. ).
De Leon subsequently activated his emergency lights and stopped the Mazda on the shoulder of I-10 near Defrain Boulevard, (see Dkt. 26, De Leon Decl. at ¶ 18), about five miles west of the CAIS. (See Dkt. 60, Transcript at 54). De Leon does not recall at which point he caught up with the Mazda within that five mile section of the I-10. (See id. ). De Leon approached the Mazda and identified himself to defendant and Todd Lewis, whom he observed for the first time. (See Dkt. 26, De Leon Decl. at ¶ 19). De Leon asked both occupants for their identification, and defendant produced an expired identification card and Todd Lewis produced a California identification card. (See id. at ¶ 22). Neither defendant nor Todd Lewis had a valid driver's license. (See id. ). De Leon also asked about the ownership of the Mazda, and defendant responded that it was a rental. (Id. at ¶ 23). Defendant explained that his girlfriend rented the vehicle and that he did not have the rental agreement. (See id.; Dkt. 60, Transcript at 59-60).
De Leon claims he asked defendant whether he had any illegal contraband in the vehicle and that defendant responded that he had some weapons, specifically "two long arms and three handguns in the trunk[.]" (See Dkt. 26, De Leon Decl. at ¶ 24). According to De Leon, defendant then agreed to allow De Leon to "verify that the weapons were not illegal or stolen." (Id. at ¶¶ 25-26). De Leon asserts that he asked defendant and Todd Lewis to "step out of the vehicle one-by-one" to detain them while he verified the weapons. (See id. at ¶ 26). De Leon claims that while he was detaining them, both defendant and Todd Lewis gave their consent for De Leon to search the "entire vehicle and all of its contents." (See id. at ¶¶ 31 & 33-34). Defendant asserts that he did not give consent to De Leon or any other agent, verbal or otherwise, to search the Mazda. (See Dkt. 60, Transcript at 98; Dkt. 22, Lewis Decl. at ¶ 8). According to defendant, De Leon did not ask whether he or Todd Lewis had guns or any other contraband before ordering them out of the vehicle. (See id. at ¶ 7).
Wilson and Herrera arrived at the location of the stop at approximately 11:50 a.m. (See Dkt. 26, Wilson Decl. at ¶ 9). Relying on De Leon's representation that defendant and Todd Lewis gave their consent for a search of the Mazda, (see id. at ¶ 10), Wilson and Herrera searched the vehicle and found numerous firearms. (Id. at ¶ 11). The CBP agents then notified the ATF. (Id. at ¶ 16). When ATF agents arrived, they opened packages found in the Mazda which contained additional weapons and magazines. (See id. at ¶ 21). According to ATF Special Agent Arnesha White ("White"), defendant refused to sign ATF's written consent form for a search of the Mazda, but eventually provided verbal consent for ATF's search. (See Dkt. 26, Declaration of Arnesha White ("White Decl.") at ¶ 5).
DISCUSSION
The Fourth Amendment protects individuals from "unreasonable searches and seizures[.]" U.S. Const., amend. IV. Detention of individuals during the stop of an automobile, "even though the purpose of the stop is limited and the resulting detention quite brief[,]" constitutes a "seizure"
*1109 within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). "[T]he Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops." United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000) ; United States v. Trengali, 2006 WL 1050170, *4 (N.D. Cal. 2006) (same). "Reasonable suspicion is formed by specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." Lopez-Soto, 205 F.3d at 1105 (internal quotation marks omitted); United States v. Twilley, 222 F.3d 1092, 1095 (9th Cir. 2000) (same).
"Officers on roving border patrols, like the one at issue here, may conduct brief investigatory stops without violating the Fourth Amendment if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." United States v. Valdes-Vega, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc ), cert. denied, --- U.S. ----, 134 S.Ct. 2743, 189 L.Ed.2d 777 (2014) (internal quotation marks and citations omitted); see id. at 1078 n. 1 (noting that the Supreme Court "has expressly applied" the reasonable suspicion standard to Border Patrol agents when "reviewing vehicle stops based on reasonable suspicion of smuggling."). However, "[a]s federal officers, Border Patrol agents are limited to their statutory powers." United States v. Juvenile Female, 566 F.3d 943, 948 (9th Cir. 2009), cert. denied 558 U.S. 1134, 130 S.Ct. 1111, 175 L.Ed.2d 923 (2010) ; see Ortiz v. U.S. Border Patrol, 39 F.Supp.2d 1321, 1326 (D.N.M. 1999) ("Border Patrol agents are not general law enforcement officers. Instead, ... their authority and duties are circumscribed by statute and limited in scope."); United States v. Santa Maria, 15 F.3d 879, 881 (9th Cir. 1994) ("Section 1357(a)(3) only authorizes the Border Patrol to 'have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.' ") (emphasis omitted); see also United States v. Diamond, 471 F.2d 771, 773 (9th Cir. 1973) ("[C]ustoms agents are not general guardians of the public peace, as are state or local police. Their powers ... to search and arrest persons are limited by statute."). "To hold otherwise would grant Border Patrol agents unfettered discretion to investigate suspected violations of any and all cognizable criminal laws[;] it would, in effect, give to the Border Patrol the general police power that the Constitution reserves to the States." Juvenile Female, 566 F.3d at 948 (internal citation omitted).
The "government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement." United States v. Job, 871 F.3d 852, 860 (9th Cir. 2017) ; see United States v. Cunag, 386 F.3d 888, 894 (9th Cir. 2004) (burden of proof is preponderance of evidence at suppression hearing). The reasonable suspicion standard "is not a particularly high threshold to reach." Valdes-Vega, 738 F.3d at 1078. "Although ... a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Id."In the context of border patrol stops, the totality of the circumstances may include characteristics of the area, proximity to the border, usual patterns of traffic and time of day, previous alien or drug smuggling in the area, behavior of the driver, appearance or behavior of passengers, and the model and appearance of the vehicle. Not all of these factors must be present or highly probative *1110 in every case to justify reasonable suspicion. And the facts must be filtered through the lens of the agents' training and experience." Id. at 1079 (citing factors outlined by Supreme Court in United States v. Brignoni-Ponce, 422 U.S. 873, 884-85, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975) ).
"The nature of the totality-of-the-circumstances analysis also precludes [courts] from holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case." Valdes-Vega, 738 F.3d at 1078. In reviewing law enforcement's basis for reasonable suspicion, a court cannot engage in a " 'divide-and-conquer analysis' because even though each of the suspect's acts was perhaps innocent in itself ... taken together, they may warrant further investigation." Id. (some internal quotation marks and alterations omitted). However, a court may "conclude that some factors in a particular case are more probative than others[.]" Id. at 1079 (internal quotation marks and brackets omitted). For example, in Valdes-Vega, an en banc panel of the Ninth Circuit concluded that CBP agents had "an objective and particularized suspicion" for an investigatory stop of the defendant's truck where the agents had eight and eleven years of experience, respectively, investigating "alien and drug smuggling[;]" the location of the stop, while it was 70 miles north of the border, the truck had "pass[ed] through the [Temecula Border Patrol Checkpoint]," "the northernmost (that is, the last) checkpoint" on an interstate used frequently by "smugglers coming from Mexico[;]" the defendant's vehicle had Mexican license plates making "the possibility that it had recently crossed the border significantly more likely[;]" and "perhaps one of the most important factors in the total circumstances[, b]oth agents saw the truck excessively speeding, changing lanes frequently, weaving in and out of traffic, cutting off other drivers, causing them to brake-basically an erratic driving pattern" or "evasive maneuvering." Id. at 1077 & 1079-80 (internal quotation marks omitted).
I. REASONABLE SUSPICION.
The government asserts that "the facts here present an even stronger case of reasonable suspicion than the facts in Valdes-Vega." (Dkt. 26, Government's Opposition to Defendant's Motion [ ] ("Opp.") at 15). The government notes that De Leon had more years of experience than either of the agents in Valdes-Vega, that the I-10, like Interstate 15, is known to be used by smugglers, that defendant was acting suspiciously at the Flying J, a known staging area for smugglers, and defendant's driving was suspicious. (See id. at 15-16). The government also argues that defendant's use of a rental vehicle was suspicious because smugglers use rental cars to limit their losses in the event that they are caught. (See Dkt. 62, Government's Supplemental Brief in Opposition ("Govt's Post-Hear. Br.") at 4).
The court assesses De Leon's basis for reasonable suspicion "in the full context of [this] particular case." See Valdes-Vega, 738 F.3d at 1079. Beginning with the proximity of the stop to the international border-"a paramount factor" in reviewing De Leon's stop of the Mazda, see United States v. Olivares-Pacheco, 633 F.3d 399, 402 (5th Cir. 2011) -De Leon pulled defendant over near Blythe, California, which is at least 90 air miles from United States border with Mexico. (See Dkt. 60, Transcript at 54 & 86). This makes the stop 20 miles farther from the border than the stop in Valdes-Vega. Also, this stop was only ten miles from the presumptive 100 mile limit imposed on the authority of CBP
*1111 agents to make stops. See Valdes-Vega, 738 F.3d at 1079 ; 8 U.S.C. § 1357(a)(4) (arrest authority for CBP agents); 8 C.F.R. § 287.1(b) (defining "[r]easonable distance" from the border as "not exceeding 100 air miles" unless "unusual circumstances" are present). In Valdes-Vega, the "location of the stop, even though 70 miles north of the border, was significant because it was [near] the northernmost (that is, the last) checkpoint on the interstate." 738 F.3d at 1079. Here, De Leon does not assert, (see, generally, Dkt. 26, De Leon Decl.), and the government does not argue, (see, generally, Dkt. 26, Opp.), that there is a CBP checkpoint near the location where De Leon effected the stop. Indeed, the government did not present any evidence as to the location of the nearest border checkpoint to where the stop took place.
The court also considers the other "characteristics of the area[.]" See Valdes-Vega, 738 F.3d at 1079. De Leon testified that the Flying J gas station where he first encountered defendant is a known staging area for westbound smugglers.[4] (Dkt. 26, De Leon Decl. at ¶ 7). At the evidentiary hearing, however, De Leon acknowledged that the I-10 "is the main driving route" between the Phoenix and Los Angeles metropolitan areas, and that the vast majority of the individuals using the I-10 and the Flying J station are not smugglers. (See Dkt. 60, Transcript at 11 ("Q. So the portion of I-10 that you patrol has thousands of cars on it everyday, right? A. Yes, sir. Q. And the vast majority of those vehicles have nothing to do with smuggling, right? A. Most of them, yes, sir."); id. at 13 ("Q. And gas is generally cheaper in Arizona than it is in California? A. Yes, sir. Q. So lots of people are stopping at the Flying J to buy gas, right? A. Yes, sir. Q. It's a busy place? A. Very busy ... Q. Okay. You're not here claiming that all those vehicles are smugglers, right? A. No, sir.") ).
"[R]easonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1121 (9th Cir. 2002). The I-10 between Phoenix and Los Angeles is the major east-west interstate in the southwestern United States and the government's broad generalization relating to the I-10 could subject a very large category of presumably innocent travelers-virtually hundreds of thousands of citizens and residents-to "random seizures[.]" See Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). Indeed, the characteristics of a widely used highway such as the I-10 differ, in many ways, from the locations of stops in cases in which reasonable suspicion has been found. For example, defendant was not traveling on a "primitive dirt road" after dark that would allow him to avoid a border checkpoint, see United States v. Arvizu, 534 U.S. 266, 269, 122 S.Ct. 744, 748, 151 L.Ed.2d 740 (2002), or an "obscure country road" nearly adjacent to the border in the early morning. See United States v. Tiong, 224 F.3d 1136, 1138-40 (9th Cir. 2000) (location of stop quarter mile from the Canadian border at 5:30 a.m. on "obscure country road" supported customs officer's reasonable suspicion of smuggling). Nor was defendant traveling northbound on the interstate, *1112 away from the border and inland into the United States, as in Valdes-Vega. Compare Valdes-Vega, 738 F.3d at 1076, with Olivares-Pacheco, 633 F.3d at 405 (no reasonable suspicion where, among the totality of the circumstances, the defendant's "vehicle was headed west-to-east, not south-to-north, away from the border"). In fact, unlike the Interstate 15 in Valdes-Vega, which is "a highway linked to the border[,]" 738 F.3d at 1076, the I-10 between Los Angeles and Phoenix is not linked to any international border. In short, "[e]ven assuming the general proposition that alien smuggling occurs with a certain level of frequency on [the I-10], reasonable suspicion cannot be based on overbroad generalizations.... Therefore, although relevant, the fact that Defendant was using this road is of only minimal significance." Sigmond-Ballesteros, 285 F.3d at 1121 ; see United States v. Morales Loya, 2015 WL 3991062, *5 (D. Ariz. 2015) ("[A] location or route frequented by [undocumented] immigrants, but also by many legal residents, is not significantly probative to an assessment of reasonable suspicion.").
The government also argues that the fact defendant was driving a rental car, his demeanor, and his erratic driving supported De Leon's reasonable suspicion. (See Dkt. 26, Opp. at 15-17; Dkt. 62, Govt's Post-Hear. Br. at 2-5). As noted earlier, De Leon believes the barcode sticker indicating the Mazda was a rental car was suspicious because "rental cars are often used in the transportation of undocumented aliens and contraband in an attempt to minimize los[s]es if [smugglers] run into law enforcement." (Dkt. 26, De Leon Decl. at ¶ 7). Other than the barcode sticker, De Leon did not see any other suspicious characteristics in the Mazda, such as Mexican license plates or "any other indicia that it had ever been to Mexico," as in Valdes-Vega. (See Dkt. 60, Transcript at 19); Valdes-Vega, 738 F.3d at 1079 ("The fact that Valdes-Vega's truck had Mexican license plates made the possibility that it had recently crossed the border significantly more likely."). De Leon had not received any "intelligence reports" from other CBP agents closer to the border to be on the lookout for a vehicle matching the Mazda's description. (See Dkt. 60, Transcript at 17); cf. United States v. Zambrano, 76 Fed.Appx. 848, 851-52 (10th Cir. 2003) (in affirming district court's decision that a border patrol agent had reasonable suspicion to stop approximately 70 miles from the border, the Tenth Circuit stated that it was "an uncomfortable stretch to believe the agent possessed a particular basis for suspecting legal wrongdoing based only on [defendant's] behavior." However, other factors supported a finding of reasonable suspicion such as the agent, while following the vehicle, learned that the vehicle had crossed the border an hour and a half earlier without being searched). The Mazda did not initially catch De Leon's attention for driving erratically as it entered the Flying J. (See Dkt. 60, Transcript at 47-48). The Mazda did not appear to have a custom suspension system or tinted windows, both of which would have been consistent with smuggling tactics. (See Dkt. 22-1, Report at 5; Dkt. 60, Transcript at 16). De Leon also testified that the Mazda was an SUV, making it more likely to have natural "voids" within its interior structure in which smugglers could hide contraband, (see Dkt. 60, Transcript at 78-79), but De Leon did not list this reason as a basis for his reasonable suspicion in either his initial report or in his declaration. (See, generally, Dkt. 22-1, Report; Dkt. 26, De Leon Decl.)[5] ; cf.
*1113 Trengali, 2006 WL 1050170, at *6 (denying motion to suppress resulting from traffic stop for driver's failure to use turn signal because officer's statements were consistent and credible throughout the incident, in his report, and during his testimony at the evidentiary hearing).
Though the Mazda had a rental car sticker, "[l]ike many other cars on the I-10," (see Dkt. 60, Transcript at 44), "[s]omething caught" De Leon's attention such that he watched Lewis as he parked, exited the vehicle, and walked by him into the gas station.[6] (See id. at 24). On cross-examination De Leon did not admit to "staring" at defendant, but agreed that he was watching him "pretty consistently" at the Flying J. (See id. ). When defendant walked past De Leon, who was uniformed and equipped with a visible gun holster, he "put his head down, and quickly walked inside the store." (Dkt. 26, De Leon Decl. at ¶ 10). This struck De Leon as suspicious, because in his experience, "usually at Flying J, most [people] will come by[ and say] how you doing, sir, you know, good morning, you know, thanks for your service, stuff like that." (See Dkt. 60, Transcript at 82). Defendant contends that De Leon was an intimidating figure, given his consistent eye contact on defendant from the time he arrived at the Flying J, De Leon's "muscular" frame, and that he was "outfitted like a warrior in uniform, boots, a tactical vest and a gun in a visible holster."[7] (Dkt. 65, Defendant's Post-Evidentiary Hearing Brief ("Defendant's Post-Hear. Br.") at 5-6; see Dkt. 60, Transcript at 21-23). Defendant's decision not to wave to or greet De Leon on his way into the gas station-perhaps because he was intimidated by De Leon[8] -is given no more than "scant weight." As the Ninth Circuit has stated, "[g]iving more than scant weight" to these types of "subjective impressions would allow Border Patrol agents to seize cars simply because they *1114 do not like the look on the occupant's face." United States v. Garcia-Camacho, 53 F.3d 244, 248 (9th Cir. 1995). "The skepticism with which this factor is treated is in large part due to the fact that reliance upon 'suspicious' looks can so easily devolve into a case of damned if you do, equally damned if you don't." United States v. Montero-Camargo, 208 F.3d 1122, 1136 (9th Cir. 2000) ; see United States v. Bloom, 975 F.2d 1447, 1458 (10th Cir. 1992), overruled on other grounds by United States v. Little, 18 F.3d 1499, 1504 (10th Cir. 1994) ("Nothing in the record indicates whether [a Border Patrol agent] had any prior knowledge of defendant, so we do not know how [the agent] would know whether Defendant was acting nervous and excited or whether he was merely acting in his normal manner. Rather, Defendant's appearance to [the agent] is nothing more than an inchoate suspicion or hunch.") (internal quotation marks omitted).
De Leon stated in his declaration that defendant waited until De Leon left the Flying J before defendant emerged from the store. (See Dkt. 26, De Leon Decl. at ¶ 11). De Leon's testimony at the evidentiary hearing, however, undermines his claim that defendant intentionally "waited" for him to clear the area. (See Dkt. 60, Transcript at 29-33) ("Q. You don't know what Mr. Lewis did in the store? A. No, I don't. Q. You didn't see him leave the store? A. No, I didn't.... Q. So when you say he waited until you left the area, you just mean that he was still in the Flying J when you left the area, right? A. Yes, sir."). And neither De Leon's report nor his declaration provide an estimate as to how long Lewis remained inside the store before De Leon decided to leave the gas station. (See, generally, Dkt. 22-1, Report at 5-6; Dkt. 26, De Leon Decl. at ¶ 11).
The government argues that Lewis continued to act suspiciously at the CAIS because, according to De Leon, defendant "appeared to tense up his upper body as he passed" De Leon's patrol car and "tilted his head slightly down and to the right[,] away from [De Leon] and merging traffic[.]"[9] (Dkt. 26, Opp. at 16; Dkt. 26, De Leon Decl. at ¶ 13). De Leon claims that defendant's conduct "was not normal behavior for passing motorists." (Dkt. 26, De Leon Decl. at ¶ 13). De Leon's testimony at the evidentiary hearing, however, was inconsistent, if not contradictory, on this factor.[10] Lewis was in the far left-hand of the three westbound lanes as he passed through the CAIS. (See Dkt. 60, Transcript at 37; Dkt. 26, Wilson Decl. at ¶ 6). De Leon and Wilson were parked in the median just south of that lane, (see Dkt. 60, Transcript at 38), meaning they would *1115 have been to Lewis's immediate left as he passed them. Because the three westbound lanes merged into two lanes after the CAIS, Lewis would have looked to his right to locate merging traffic-not to his left toward the agents, because, of course, no merging traffic would be coming from that direction. Confronted with these facts at the evidentiary hearing, De Leon conceded as much.[11] (See id. at 39) ("Q. Okay. You said one of the things that caught your attention about what he was doing is that he was looking away from you in merging traffic, right? A. Right. Q. Okay. He's in the left lane? A. Yes.... Q. There is no merging traffic coming from the left, [correct]? ... Q. The other cars are coming from the right, correct? A. Yes, sir. Q. Okay. So if he wants to see where the other cars are, he's looking to the right, [correct]? A. Yes.").
De Leon's credibility was further damaged at the hearing when he was impeached with evidence of recent untruthful and fraudulent behavior while on duty. (See Dkt. 60, Transcript at 70-73). In his 15 years with CBP, De Leon has been investigated for misconduct on approximately five occasions, and was reprimanded for the misuse of his government-issued credit card. (See id. at 70-71). De Leon admitted that he had been reprimanded in 2015 for failing to pay a balance of more than $7,000 on his government-issued credit card and was again reprimanded in 2016 for misusing the card to pay for personal family expenses. (See id. at 71). De Leon acknowledged that during CBP's investigation into his credit card misuse, the investigating agent thought that De Leon was not being honest. (See id. at 72). The investigator found that De Leon was "deliberately vague and not completely forthcoming" and that he frequently fell back on "stating that he did not recall" or by "pleading ignorance of the facts."[12] (See Dkt. 52, Sealed Addendum to Joint Exhibit Stipulation, Exhibit 139, Defendant's Sealed Exhibit ("Misconduct Report") at 10-11).
On the (questionable) basis of what he observed at the CAIS, De Leon decided to *1116 pursue Lewis further. (See Dkt. 26, De Leon Decl. at ¶¶ 13-14). The government argues that "akin to defendant's driving in Valdes-Vega," Lewis's driving after going through the CAIS was suspicious because he "was driving over 80 mph in 70 mph zone and then reduced his speed as if he did not want Agent De Leon to stay behind him." (Dkt. 26, Opp. at 16). According to the government, defendant "swerved from the left lane to the right lane and even traveled in the middle of two lanes for about a quarter mile[,]" and eventually "reduced his speed to approximately 50 mph and would not pass any other vehicle on the road." (Id. at 16-17). In response, defendant contends that he was traveling with the flow of traffic, which was above the 70 miles per hour speed limit, and that "he saw a law enforcement vehicle bearing down on him at a high speed and then tailgating him; that he slowed down and then switched lanes to let the law enforcement vehicle pass; that when he switched lanes, the law enforcement vehicle switched lanes to stay behind him; that in the right lane he got stuck behind a slow moving truck; and then was distracted by having the law enforcement vehicle tailing him and unsure whether it was permissible for him to switch lanes to speed up and pass the truck." (Dkt. 65, Defendant's Post-Hear. Br. at 6-7; see Dkt. 60, Transcript at 94-96).
De Leon's testimony at the evidentiary hearing appears to confirm defendant's account. For instance, De Leon estimated that he was driving up to 100 miles per hour to catch the Mazda and when pressed for an answer as to how close he got to the vehicle, i.e., whether he was tailgating defendant, De Leon responded that he "didn't measure" the distance and that he didn't remember. (See Dkt. 60, Transcript at 50-51). Further, De Leon testified that as he approached the Mazda, Lewis was not "weaving in and out" of traffic or from lane to lane, or suddenly changing speeds. (See id. at 50-51 & 54-55). Nor did Lewis attempt to evade De Leon by exiting off of the I-10, and Lewis did not increase his speed but "actually started slowing down." (See id. at 54-55).
In contrast, the defendant's pickup truck in Valdes-Vega was "traveling faster than the flow of traffic and passing many cars[.]" See 738 F.3d at 1076-77. The truck made "at least ten erratic lane changes without signaling" and the CBP agent following the truck eventually lost sight of it "because it was moving so quickly and weaving in and out of traffic." See id. at 1077 (internal quotation marks omitted). Indeed, the agent called another unit to assist him in tracking down the defendant, and when the second agent reached the truck, he observed that it was "speeding at well over 90 miles per hour" while the flow of traffic was about 70 or 80 miles per hour and the speed limit was 70 miles per hour. See id. (internal quotation marks omitted). Here, De Leon had no difficulty catching up to the Mazda and pulling defendant over within five miles of the CAIS. (See Dkt. 60, Transcript at 42 (De Leon accelerated from a full stop and caught the Mazda despite the Mazda's "head start" from the inspection station) & 54 (De Leon stopped defendant five miles from the inspection station) ). Moreover, as noted above, the stop in Valdes-Vega took place near a border patrol checkpoint and after the truck had gone through the border check point. See 738 F.3d at 1077 & 1079. Those facts were relevant to both the characteristics of the area and the defendant's driving, because the CBP agent was able to observe how the defendant's driving changed as he approached the checkpoint, i.e., he "first slowed down and then speeded up as if to get through the checkpoint quickly." See id. at 1079.
With respect to Lewis's decision to change to the right-hand lane and reduce *1117 his speed, (see Dkt. 26, De Leon Decl. at ¶ 17; Dkt. 60, Transcript at 85), De Leon agrees that Lewis ended up behind a large truck, causing him to slow down. (See Dkt. 60, Transcript at 85). A defendant's choice to change into the slow lane-even suddenly-is "conduct [that] seems perfectly reasonable given that a marked patrol car was approaching in the lane behind him at 90 miles per hour." United States v. Robert L., 874 F.2d 701, 704 (9th Cir. 1989) ; see Garcia-Camacho, 53 F.3d at 247 (noting that "it is perfectly consistent with innocent driving that a driver might slow down near a Border Patrol car"). Further, the government appears to take a "damned if you do, equally damned if you don't" position, see Montero-Camargo, 208 F.3d at 1136, by faulting defendant for remaining behind the large truck instead of changing lanes (again) and speeding past De Leon's vehicle, putting distance and traffic between defendant and De Leon. "[I]f Defendant had sped up, he would have run the risk of exceeding the speed limit, thereby giving [the agent] probable cause to stop the vehicle[.] Worse yet, [the agent] could have concluded that Defendant was trying to evade him. Based on Defendant's available options, it is, in fact, difficult to imagine what Defendant could have done at that point that might not have appeared suspicious to a Border Patrol agent."[13] Sigmond-Ballesteros, 285 F.3d at 1122 (internal citations, quotation marks, and brackets omitted).
II. TOTALITY OF THE CIRCUMSTANCES.
In sum, looking at the whole picture-the totality of circumstances-the court is not persuaded that the government has established that De Leon had "a particularized and objective basis for suspecting the [defendant] of criminal activity." United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Taken in combination, the factors relied on by the government merit little weight or no weight individually, and added together they are insufficient to justify De Leon's stop of the Mazda. See United States v. Burton, 583 Fed.Appx. 812 (9th Cir. 2014) ("The evidence the officers relied upon in stopping Burton's vehicle does not, individually or collectively, support a finding of reasonable suspicion."). De Leon's inconsistent and contradictory testimony at the evidentiary hearing undermined much of the government's asserted basis for reasonable suspicion, including defendant's decision to: (1) "wait" for De Leon to leave the gas station, (Dkt. 26, Opp. at 15-16); (2) avoid looking at De Leon as defendant went through the CAIS, (see id. at 16); and (3) defendant's allegedly suspicious driving while being pursued by De Leon. (See id. at 17). The remaining factors-that defendant was traveling on the I-10, did not greet De Leon at the gas station, and that his car had a barcode sticker indicating it was a rental car "[l]ike many other cars on the I-10," (see Dkt. 60, Transcript at 44)-"describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." Reid, 448 U.S. at 441, 100 S.Ct. 2752 ; see *1118 United States v. Ortiz-Gualajara, 2017 WL 1906950, *6 (D. Ariz.), report and recommendation adopted, 2017 WL 1862168 (D. Ariz. 2017) ("The Court is cognizant of the directives of the Supreme Court that lower courts should not engage in a 'divide-and-conquer' analysis. [ ] However, the inferences made by the agent in this case were not reasonable. Most of the facts cited by the Government are based on broad profiles that are simply not reliable indicators of criminal activity. The Court finds that reasonable suspicion did not exist to believe that Defendant was engaged in illegal activity."). Taken together, these facts, even when filtered through the "lens of the agent['s] training and experience[,]" see Valdes-Vega, 738 F.3d at 1079, establish only that defendant was using a "[v]ery busy" gas station, (see Dkt. 60, Transcript at 13), on the "main driving route" through the southwestern United States, (see id. at 10), in a vehicle that had no "indicia that it had ever been to Mexico," (see id. at 19), that De Leon "pretty consistently" watched defendant, (see id. at 24), who, according to De Leon, acted nervously, and that De Leon waited for and pursued defendant at a high speed, likely provoking defendant to do what most other drivers would do in a similar situation, i.e., move to the slow lane in order to allow the agent to pass. See Sigmond-Ballesteros, 285 F.3d at 1122. For the reasons discussed above, the court places little significance on the factors relating to defendant's reactive behavior as the driver of the Mazda. This leaves only the environmental factors of using a busy gas station on the I-10, almost 100 miles from the border.[14] These factors are not at all unusual, much less suggestive of criminal conduct. In short, based on the totality of the circumstances, including the location of the stop, defendant's driving, the agent's testimony (much of which the court did not find credible), and the other factors discussed above, the court finds that De Leon did not have "an objective and particularized suspicion" that Lewis was "engaged in wrongdoing" before stopping him. See Morales Loya, 2015 WL 3991062, *5 ("the facts taken into consideration separately and in the 'totality of the circumstances analysis' in this case demonstrate that [the] Agent [ ] did not possess the requisite reasonable suspicion to stop Defendant.").
Finally, because the court finds that the stop of the Mazda violated the Fourth Amendment, all evidence flowing from the stop is suppressed and the court need not address the parties' disputes regarding the search of the Mazda. See Twilley, 222 F.3d at 1097 ("Because we conclude that the stop was not supported by reasonable suspicion, and because the subsequent search was a product of the stop, the evidence leading to Twilley's conviction should have been suppressed.").
CONCLUSION
Based on the foregoing, IT IS ORDERED THAT:
1. Defendant Timothy Lewis's Motion to Suppress Evidence (Document No. 22) is granted.
2. The firearms and ammunition seized from defendant's vehicle on December 7, 2016, as well as the statements made by defendant and Todd Lewis to law enforcement following the stop, are hereby excluded.

It is unclear from De Leon's testimony how he knew that defendant noticed the marked patrol vehicle. (See Dkt. 60, Transcript at 81-82) ("[Q.] So in this particular case then, what was it about what [defendant] did that conveyed to you that he appeared to notice your marked Border Patrol car? A. Just pretty much not making contact.").

There is no indication as to precisely how long defendant or De Leon were at the Flying J, but it was for some time shorter than half an hour. (See Dkt. 26, De Leon Decl. at ¶ 6 (defendant arrived at 11:00 a.m.); See Dkt. 26, Declaration of Eric Wilson ("Wilson Decl.") at ¶ 6) (CBP observed the Mazda crossing into California at 11:30 a.m.) ).

Wilson also noticed that the Mazda was a rental and that the occupants "appeared to have a tense upper body posture and to purposefully avoid looking" in the agents' direction. (See Dkt. 26, Wilson Decl. at ¶ 6).

Though, in De Leon's experience, smugglers use "rental cars traveling west bound on I-10 use the Flying J gas station to stage before going into California[,]" (see Dkt. 26, De Leon Decl. at ¶ 7), De Leon testified during the evidentiary hearing that he did not know whether the Mazda entered the Flying J from the westbound or eastbound direction. (See Dkt. 60, Transcript at 21).

De Leon also testified that the when he saw defendant in the Mazda, he did not think that the SUV fit defendant's "personality" because "[u]sually if somebody rents an SUV, it's a family[.]" (See Dkt. 60, Transcript at 46). To the extent De Leon testified that defendant was suspicious in part because he was traveling alone in an SUV, the court is not persuaded. De Leon was not able to tell if anyone else was in the vehicle at the gas station, the CAIS, or while following it down the I-10, (see id. at 51-52), and thus could not verify whether Lewis was traveling with family members, or others, until after he stopped the Mazda.

De Leon expressly disclaimed that he watched or followed defendant because of defendant's race. (See Dkt. 60, Transcript at 84-85).

De Leon has worked as a physical training instructor at the Border Patrol Academy, has been an instructor in unarmed combat, fought in boxing and mixed martial arts matches, and agrees that he carries his "presence like somebody who knows how to handle [himself] in a fight[.]" (See Dkt. 60, Transcript at 22).

In assessing defendant's behavior as he walked passed De Leon at the gas station, defendant asserts that his race, age, and gender cannot be ignored, because "many young black men have had negative experiences with police" that affect their comfort level around law enforcement figures. (See Dkt. 65, Defendant's Post-Hear. Br. at 5 n. 2). Defendant's argument finds support in the border patrol context in Garcia-Camacho, where the Ninth Circuit cautioned that giving too much weight to an officer's "subjective impressions" about a suspect's eye contact or nervous demeanor "would be especially dangerous because the law expressly allows Border Patrol agents to take an individual's race into account in determining whether to restrain that individual's freedom and, as a result, any abuse or overreaching may disparately impact minorities." 53 F.3d at 244 & 248 ; see also Com. v. Warren, 475 Mass. 530, 540, 58 N.E.3d 333 (2016) ("the finding that black males in Boston are disproportionately and repeatedly targeted for [stops] suggests a reason for flight totally unrelated to consciousness of guilt. Such an individual, when approached by the police, might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity.").

Wilson also stated that defendant "purposefully avoided looking" in the agents' direction, (see Dkt. 26, Wilson Decl. at ¶ 6), and that defendant's and Todd Lewis's body posture as they passed through the CAIS was "consistent with persons that may be nervous about [Border Patrol's] presence[.]" (Id. at ¶¶ 6-7).

De Leon repeatedly claimed to not recall events from the stop and search and sought to rely on what was written in his declaration instead of testifying from his own memory, including as to facts important to the reasonable suspicion analysis. (See, e.g., Dkt. 60, Transcript at 14 ("Q. Okay. But you don't remember today whether you saw a rental car sticker on the-on the car at the Flying J? A. I did see a rental car sticker on the rental car. Q. At the Flying J? A. I believe so. Can I see my declaration?"); id. at 37 (Q. Okay. And Mr. Lewis was in the far left lane, correct? A. I don't recall which side he was on, either left, far left. Let me look at my-Q. Would it refresh your recollection-let me-A. What paragraph?"); id. at 45 ("Q. Do you remember [defendant] sitting up straight [at the inspection station]? A. I don't recall. Q. You don't-stop looking through that [declaration]. A. Okay.") ).

The government did not address this discrepancy in its post-hearing brief, (see, generally, Dkt. 62, Govt's Post-Hear. Br. at 4-5), and it was not the only time at the evidentiary hearing that De Leon admitted his declaration was inaccurate. In his declaration, for example, De Leon stated that after the stop he removed Todd Lewis from the Mazda and placed him in the back of the patrol car before Wilson or Herrera arrived, temporarily leaving defendant alone in the Mazda. (See Dkt. 26, De Leon Decl. at ¶¶ 26-28). When confronted with the clear safety implications of leaving a suspect alone and unrestrained after having learned that the suspect had access to multiple firearms, (see Dkt. 60, Transcript at 61-63), De Leon contradicted his declaration and testified that he "didn't pull them out until [his] partner showed up[.]" (See id. at 63). After being impeached with his declaration, De Leon stated that his testimony was correct and that his declaration was not. (See id. at 67).

Although the initial recommendation for De Leon's punishment of a two week suspension without pay was reduced to an oral counseling, (see Dkt. 60, Transcript at 72-73), the details in the misconduct report strongly suggest that De Leon used his government credit card to take out large cash advances, (see Dkt. 52, Misconduct Report at 9 ($2,690 in cash advances on one day) ), make unauthorized personal purchases, (see id. ("De Leon spent a total of $1,091.20 in just four visits to Walmart") ), and that he failed to use reimbursement money issued to him to pay down the card balance from his legitimate purchases. (See id. at 10). Indeed, the investigator concluded that "it's only logical that the reimbursed funds have been liquidated on other personal items by [ ] De Leon, even if he cannot account for it [sic] himself." (Id.; see also id. at 11 ("Even in the unrealistic scenario that [ ] De Leon is correct, and he has not been reimbursed for some of his travel vouchers totaling $3793.26, [ ] De Leon should only have an outstanding balance of $3753.56.").

"Given the limited options available to him, it is difficult to imagine a more rational reaction than Defendant's." Sigmond-Ballesteros, 285 F.3d at 1122 (citing Calif. Dep't of Motor Vehicles, Calif. Driver Handbook 65 (2000) ) (instructing drivers to " 'lose' the tailgater as soon as you can by changing lanes. If you can't change lanes, slow down enough to encourage the tailgater to go around you. If this does not work, pull off the road when it is safe and let the tailgater pass.").

Again, the government did not put forth any evidence as to the nearest international border crossing to the area where the stop occurred.